1  BRIAN BARRY (SBN 135631)
   **LAW OFFICE OF BRIAN BARRY**
2  1801 Ave. of the Stars, Suite 307
   Los Angeles, California 90067
3  Telephone:  (310) 788-0831
   Facsimile:   (310) 788-0841
4
   **BRODSKY & SMITH, LLC**
5  MARC L. ACKERMAN
   EVAN J. SMITH
6  JASON L. BRODSKY
   Two Bala Plaza, Suite 602
7  Bala Cynwyd, PA 19004
   Telephone:   (610) 667-6200
8  Facsimile    (610) 667-9029
   **Attorneys for Plaintiff**
9
                UNITED STATES DISTRICT COURT
10
              CENTRAL DISTRICT OF CALIFORNIA
11
                     WESTERN DIVISION
12
   RANDY GISH, Derivatively on Behalf   ) Case No. CV 03-4680-NM(AJWx)
13 of BLUE RHINO, INC.,                 )
                                        ) **AMENDED SHAREHOLDER
14              Plaintiff,              ) DERIVATIVE COMPLAINT FOR
        vs.                             ) BREACH OF FIDUCIARY DUTY
15                                      ) AND UNJUST ENRICHMENT AND
   BILLY D. PRIM, ANDREW J.             ) VIOLATIONS OF CALIF. CORPS.
16 FILIPOWSKI, MARK CASTANEDA,          ) CODE SECTIONS 25402 & 25502.2**
   STEVEN D. DEVICK, RICHARD A.         )
17 BRENNER, ROBERT LUNN, DAVID          )
   WARNOCK , JOHN H. MUEHLSTEIN         )
18 AND TIMOTHY SCRONCE,                 )
                                        )
19              Defendants,            )
                                        )
20      - and -                         )
                                        )
21 BLUE RHINO, INC., a Delaware         )
   corporation,                         )
22                                      )
           Nominal Defendant.  ) <u>DEMAND FOR JURY TRIAL</u>
23 ─────────────────────────────
24
25
26
27
28



**ORIGINAL**

1        Plaintiff alleges, upon personal knowledge as to himself and his own acts,

2 and as to all other matters upon information and belief, based upon, *inter alia*, the

3 investigation made by and through his attorneys, which includes a review of the

4 public filings of Blue Rhino, Inc. ("Blue Rhino," the "Corporation" or the

5 "Company") including, without limitation, Forms 10-K and 10-Q, annual reports,

6 proxy statements, press releases, published reports and news articles, as follows:

7

## INTRODUCTION AND OVERVIEW

8 1.    This is a stockholder's derivative action brought on behalf of Blue Rhino by

9        one of its shareholders against its entire Board of Directors and/or several of

10        the Corporation's top officers for: (i) breach of fiduciary duty in

11        misappropriating and misusing internal proprietary non-public material

12        corporate information to personally profit by illegal insider trading in the

13        Company's stock; (ii) failing to properly oversee or implement federal or

14        state laws prohibiting such illegal insider trading as well as Blue Rhino's

15        own policies and rules restricting the misuse of internal corporate

16        information for such purposes; (iii) causing Blue Rhino to be sued for, and

17        exposed to, liability for violations of the anti-fraud provisions of the federal

18        securities laws; and (iv) for the illegal insider trading in the Corporation's

19        stock in violation of California Corporations Code §§25402 and 25502.5.

20 2.    Defendants are liable as participants in a fraudulent course of business by

21        disseminating materially false and misleading statements and/or concealing

22        material adverse facts regarding the Company, including: (1) that certain

23        distributors acquired by the Company on November 22, 2002 were not

24        healthy, highly profitable, and independent of the Company, as portrayed by

25        the Defendants. In fact, the distributors acquired by Blue Rhino had lost

26        $2.8 million in the first ten (10) months of 2002 alone and owed Blue Rhino

27        $5 million in cash advances in addition to the $2.8 million in debt. Also,

28        one of the acquired distributors was in violation of its debt covenants for

- 1 -

1    2001; (2) that Defendants misrepresented that the purchase price of the
2    acquired distributors only totaled $21 million when in fact the true price of
3    the acquisition was $32 million; (3) that the Company was beginning to see
4    a decline in earnings from Overfill Protection Device ("OPD") regulations;
5    (4) that the Company's earnings projections were lacking in any reasonable
6    basis when made; and (5) that the false and misleading information
7    disseminated by Defendants caused the Company stock to trade at
8    artificially inflated prices.

9  3.  In disseminating the false and misleading information set forth in the
10   preceding paragraph, Defendants: (i) deceived the investing public
11   regarding Blue Rhino's business, operations, management and the intrinsic
12   value of Blue Rhino common stock; (ii) enabled Defendants to acquire over
13   $30 million in assets, purchased using artificially inflated Blue Rhino shares
14   in order to refinance debt upon more favorable terms with its lenders;
15   (iii) allowed Defendants to sell over 15 million worth of stock in a private
16   placement and then register those shares with a value over $23.8 million for
17   two large shareholders that had entered into the private equity deal so that
18   the shares could be sold before the truth regarding defendants' conduct was
19   revealed; and (iv) allowed certain insiders, along with entities controlled by
20   certain insiders, to sell over 160,000 shares of company stock and garner
21   illegal proceeds of more than $3.1 million.

22  4.  As a result of defendants' illegal conduct, Blue Rhino has been significantly
23   and materially damaged. First, in violation of California common law and
24   statute, certain corporate insiders have misappropriated and misused
25   material non-public proprietary information regarding defendants' inability
26   to manage and control the financial and manufacturing capabilities of the
27   Company, for their own personal profit, selling more than 160,000 shares of
28   their privately held Blue Rhino stock and garnering for themselves illicit

- 2 -

1         proceeds of over \$3.1 million. In addition, the false statements made by
2       defendants, which artificially inflated the price of the Company's common
3       stock and thus permitted the corporate insiders to profit from their insider
4       trading activities, have resulted in the Company being named a defendant in
5       several securities fraud class action lawsuits. These class action lawsuits,
6       now consolidated in federal district court in California, seek significant
7       damages and will cost the Company millions of dollars to defend and likely
8       millions of dollars more to settle or satisfy.

9   5.   The illegal insider trading activities of certain of the defendants will make
10       the securities class action suits much more difficult, if not impossible, to
11       defend and will provide a basis for Blue Rhino's directors' and officers'
12       liability insurance carrier to disclaim coverage under the active and
13       deliberate dishonesty exclusion or the insider trading exclusion and/or
14       negotiate a defense expense sharing allocation with Blue Rhino that will be
15       unfavorable to the Company. Moreover, these revelations of certain
16       defendants' illegal insider trading and violations of the securities laws have
17       badly damaged Blue Rhino's corporate image and good will. For at least the
18       foreseeable future, Blue Rhino will suffer from what is known as the "liar's
19       discount," a term applied to the stocks of companies who have been
20       implicated in illegal behavior and have misled securities analysts and the
21       investing public, such that Blue Rhino's ability to raise equity capital on
22       favorable terms in the future will be impaired.

23   6.   Management of Blue Rhino is antagonistic to this lawsuit and making
24       demand on the Board of Directors would be futile. The Board as a whole
25       has extremely close alliances with and allegiances to the insiders who
26       engaged in the illegal insider selling complained of herein and among each
27       other and will not bring any action directly against them on behalf of the
28       Company. Moreover, in order to properly prosecute this lawsuit, it would

1  be necessary for the Directors to sue themselves – something they are
2  unwilling to do. Such a suit would require the Directors to expose
3  themselves to multi-million dollar liability to the Company, which, due to
4  the particular language of currently utilized directors' and officers' liability
5  insurance policies (*i.e.*, the insured vs. insured exclusion), would not be an
6  insured claim, while the claims asserted via this derivative action would be
7  insured

8  7. Since the insider trading activities of the insider selling defendants are
9  illegal under specific California corporate law and are not covered by Blue
10  Rhino's directors' and officers' liability insurance, in order to adequately
11  protect Blue Rhino's interests in this situation, it is necessary for the
12  Company to seek and obtain preliminary injunctive relief against the
13  individual defendants who sold Blue Rhino stock based on misappropriated
14  proprietary corporate information, imposing a constructive trust on and/or
15  freezing those insider selling proceeds so that they will be available to Blue
16  Rhino if this suit is successful on the merits. Absent such a freeze, these
17  defendants who sold Blue Rhino stock based on inside information will
18  dissipate and/or secrete their insider sales proceeds, making it much more
19  difficult to recover those proceeds. Under these circumstances, making a
20  pre-suit demand also would unreasonably delay the pursuit of important
21  legal remedies.

22  ## JURISDICTION AND VENUE

23  8. This Court has jurisdiction over the subject matter of this action pursuant to
24  the removal of this action from state court by defendants.

25  9. Venue is proper in this District pursuant to 28 U.S.C. §1391(b). Blue Rhino
26  conducts substantial business in this District and many of the acts and
27  practices complained of herein occurred in substantial part in this District.
28  In addition, each of the Company's wholly-owned subsidiaries, Ark and

- 4 -

1       Platinum of Los Angeles, conduct significant business in and maintain
2       offices in this District. Moreover, in connection with Blue Rhino's
3       acquisition of Platinum and its distributors, many of the acts complained of
4       herein occurred in this District, including but not limited to the following:
5       a.      Platinum Propane LLC ("Platinum") and its distributors conduct
6               significant business in California and have an office located at 2880
7               Norton Avenue, Lynwood, CA;
8       b.      Defendants, through Blur Rhino, a national corporation, conducts
9               significant business in California and maintains offices, through the
10              Ark Holding Co., LLC ("Ark") acquisition at 818 West 7th Street, Los
11              Angeles, CA
12      c.      With respect to the acquisition of Platinum, Defendants caused Blue
13              Rhino to conduct  significant activities in this County, including the
14              following:
15              i.      significant asset valuation of Platinum by Blue Rhino;
16              ii.     negotiations conducted by or on behalf of Defendants
17                      regarding the acquisition of Platinum; and
18              iii.    review of both Blue Rhino's and Platinum's business records.
19      d.      With respect to the acquisition of Ark, Defendants caused Blue
20              Rhino to conduct significant activities within this County, including
21              the following:
22              i.      significant asset valuation of Ark by Blue Rhino;
23              ii.     negotiations conducted by or on behalf of Defendants
24                      regarding the acquisition of Ark; and
25              iii.    review of both Blue Rhino's and Ark's business records.
26      Additionally, the defendants named in this shareholders' derivative action have
27      received substantial compensation from their business activities within this
28      judicial district.

- 5 -

## THE PARTIES

10. Plaintiff Randy Gish is a resident of the State of Missouri who is an owner of shares of Blue Rhino stock. Plaintiff brings this action derivatively in the right of and for the benefit of Blue Rhino. Plaintiff will fairly and adequately represent the interests of Blue Rhino and the shareholders of Blue Rhino in enforcing the rights of the Company.

11. Nominal Defendant Blue Rhino is a Delaware corporation with its headquarters located at 104 Cambridge Plaza Drive, Winston-Salem, North Carolina 27104. Blue Rhino is a national provider of propane gas and propane gas accessories, including cylinder exchanges and related propane products. The Company's retail partners include Home Depot, Lowe's, Wal-Mart, Sears, KMart, Kroger, Food Lion, Win Dixie, Circle K and ExxonMobil. Ark Holdings, one of the Company's wholly owned subsidiaries and a major distributor for Blue Rhino, maintains offices in Los Angeles at 818 West 7th Street. Platinum Propane of Los Angeles also maintains offices in this District at 2880 Norton Avenue, Lynwood, California.

12. Defendant Billy D. Prim ("Prim") is, and at all times relevant to the allegations raised herein, was Chief Executive Officer ("CEO") and Chairman of Blue Rhino. He served as President of the Company from 1996 to November 2002. Defendant Prim co-founded the Company in 1994. According to the Company's FY:02 Proxy Statement, as of November 8, 2002, defendant Prim owned or controlled over 1,570,350 shares of Blue Rhino stock, approximately 10.6% of all outstanding common shares of the Company. In exchange for his purported loyalty and fidelity, defendant Prim, as one of the two individuals that served as an officer and employee-director of the Company (along with defendant Mark Castaneda), received the following very significant compensation package

- 6 -

SHAREHOLDER DERIVATIVE COMPLAINT

1       ·     from Blue Rhino during FY:02: salary – $387,996; bonus – $99,804; other

2     compensation - $132, 590, as well as the option to purchase 173,000 shares

3     of Blue Rhino stock. In addition to his dominance and control over Blue

4     Rhino as a result of his stock ownership and position as Chairman, CEO

5     and/or President of the Company, defendant Prim also has longstanding

6     personal and professional entanglements and relationships with other Board

7     members, which have prevented them and is preventing him from acting

8     independently to fulfill the fiduciary duties owed to Blue Rhino and its

9     shareholders, including:

a. Defendant Prim and defendant Andrew J. Filipowski are brothers-in-law who co-founded the Company in 1994.

b. Defendant Prim was also a director of Ark and Platinum.

c. Defendant Prim is a member of the Executive Committee (along with defendants Andrew J. Filipowski and defendant Richard A. Brenner). The Executive Committee makes recommendations to the Board of Directors concerning matters of strategic planning and operational management and has the power to address matters on behalf of the Board.

d. Defendant Prim and defendant Richard A. Brenner serve together on the Board of Directors of Southern Community Bank and Trust which has eight (8) branches in Winston-Salem, North Carolina.

e. Defendant Prim also serves on the Board of Directors of Brenner Children's Hospital & Health Services of the Wake Forest University Baptist Medical Center. The Brenner Children's Hospital is named after the family of defendant Richard A. Brenner, who is a close friend and Winston-Salem business associate of defendant Prim.

f. Defendant Prim, along with defendant Andrew J. Filipowski each own a 50% stake in Rhino Real Estate, LLC. Since 1994, Blue Rhino leases its offices in Winston-Salem from Rhino Real Estate, LLC. The lease requires the Company to pay $333,264 per year plus additional expenses and taxes.

g. In the 1990s, Defendant Prim, along with defendant Andrew J. Filipowski, founded two companies, Platinum and Ark. Allegedly, at some later date defendants Prim and Filipowski divested their interest in Platinum and Ark. In contrast, however, the Company's FY:02 Proxy Statement, states that the entity that then owned Platinum and Ark had obligations to its primary bank that were unconditionally guaranteed and secured by defendants Prim and Filipowski in the principal amount of up to $3,500,000. Regardless, in November 2002, Defendants caused the Company to acquire Ark and Platinum, each of which owned several distributors, such that Defendants Prim and Filipowski caused the Company to acquire a total of ten (10) propane distributors.

13. Defendant Andrew J. Filipowski ("Filipowski"), is, and at relevant times relevant to the allegations raised herein, was a director of Blue Rhino and Vice Chairman of the Company. He co-founded the Company in 1994 with defendant Prim. According to the Company's FY:02 Proxy Statement, as of November 8, 2002, defendant Filipowski owned or controlled over 2,067,070 shares of Blue Rhino stock, approximately 14% of all outstanding common stock. Also, as a non-employee director of the Company, defendant Filipowski receives an option to purchase 12,000 shares of common stock of the Company on the first business day after each annual meeting and an additional option for 1,000 shares based on his position as

1    the Executive Committee. In addition to his dominance and control over
2    Blue Rhino as a result of his position as a co-founder of the Company and
3    the fact he alone controls 14% of the common shares of stock of the
4    Company, defendant Filipowski also has longstanding personal and
5    professional entanglements and relationships with other Board members,
6    which have prevented them and is preventing him from acting
7    independently to fulfill the fiduciary duties owed to Blue Rhino and its
8    shareholders, including:

   a. Defendant Filipowski and defendant Prim are brothers-in-law who
      co-founded the Company in 1994.

   b. Defendant Filipowski was the principal of Platinum Venture Partners,
      LLP. Prior to the sale of Platinum Venture Partners to Computer
      Associates, defendant Prim was a partner in Platinum Venture
      Partners. Also, defendant Steven D. Devick was a principal of
      Platinum Technology International, Inc., the software developer that
      defendant Filipowski took public in 1991. Defendants Filipowski and
      Devick were among the principals/directors at Platinum Technology
      that started Platinum Venture Partners and defendant Devick was the
      Chairman of the Board and Chief Executive Officer of Platinum
      Entertainment, Inc., another related "Platinum" venture and one that
      ended in bankruptcy in July 2000.

   c. Defendant Filipowski a member of the Executive Committee (along
      with defendants Prim and Richard A. Brenner). The Executive
      Committee makes recommendations to the Board of Directors
      concerning matters of strategic planning and operational management
      and has the power to address matters on behalf of the Board.

d. Defendant Filipowski, along with defendant Prim each own a 50% stake in Rhino Real Estate, LLC. Since 1994, Blue Rhino leases its offices in Winston-Salem from Rhino Real Estate, LLC. The lease requires the Company to pay $333,264 per year plus additional expenses and taxes.

e. In the 1990s, Defendant Prim, along with defendant Andrew J. Filipowski, founded two companies, Platinum and Ark. Allegedly, at some later date defendants Prim and Filipowski divested their interest in Platinum and Ark. In contrast, however, the Company's FY:02 Proxy Statement, states that the entity that then owned Platinum and Ark had obligations to its primary bank that were unconditionally guaranteed and secured by defendants Prim and Filipowski in the principal amount of up to $3,500,000. Regardless, in November 2002, Defendants caused the Company to acquire Ark and Platinum, each of which owned several distributors, such that Defendants Prim and Filipowski caused the Company to acquire a total of ten (10) propane distributors. Defendant Filipowski was also a director of Ark and Platinum.

f. Defendant Filipowski is the Chairman and CEO of Divine, Inc., an extended enterprise solution company. Divine, Inc. is currently in bankruptcy. Defendant Filipowski is presently a defendant in a federal securities class action involving his actions at Divine, Inc. Additionally, the New York Attorney General's office is investigating activity at Divine, Inc. which occurred during the Relevant Period of the conduct alleged herein.

14. Defendant Mark Castaneda ("Castaneda") is, and at all times relevant to the allegations raised herein, was a director of Blue Rhino and Chief Financial

- 10 -

Officer of the Company. According to the Company's FY:02 Proxy Statement, as of November 8, 2002, Castaneda owned or controlled over 156,700 shares of Blue Rhino stock, approximately 1% of the outstanding common shares of the Company. In exchange for his purported loyalty and fidelity, defendant Castaneda, as one of the two individuals that served as an officer and employee-director of the Company (along with defendant Prim) received the following very significant compensation package from Blue Rhino during FY:02: salary – $192,308; bonus – $99,804; other compensation - $5, 571, as well as the option to purchase 110,000 shares of Blue Rhino stock.

15. Defendant Steven D. Devick ("Devick") is, and at all times relevant to the allegations raised herein was, a director of the Company and has served in this position since the Company's founding in 1994. According to the Company's FY:02 Proxy Statement, as of November 8, 2002, defendant Devick owned or controlled 31,193 shares of Blue Rhino stock. Also, as a non-employee director of the Company, defendant Devick receives an option to purchase 12,000 shares of common stock of the Company the first business day after each annual meeting and an additional option for 1,000 shares based on his participation on the Compensation Committee. In addition to his dominance and control over Blue Rhino as a result of his long-standing Board membership, defendant Devick also had longstanding personal and professional entanglements and relationships with other Board members which have prevented them and is preventing him from acting independently to fulfill the fiduciary duties owed to Blue Rhino and its shareholders, including:

a. Defendant Devick and defendant Filipowski are long-standing friends and business partners. Defendant Devick was a principal in Platinum

1  Technology, the software developer founded by defendant Filipowski

2  that went public in 1991 and was eventually sold to Computer

3  Associates for more than 3.5 billion dollars. Devick was also a

4  principal along with defendant Filipowski of Platinum Venture

5  Partners, the venture capital arm of Platinum Technology Defendant

6  Prim was also a partner in this venture. Defendant Devick was also a

7  co-founder of a related company, Platinum Entertainment, Inc. He

8  resigned as Chairman of the Board and Chief Executive Officer in

9  June 2000. Platinum Entertainment, Inc. filed for bankruptcy

10  protection one month later;

11  b. Defendant Devick is a member of the Company's Compensation

12  Committee, along with defendant Richard A. Brenner. They were

13  charged with, among other things, establishing the salary and

14  incentive compensation for the Company's Chief Executive Officer

15  (defendant Prim). The Compensation Committee also administers the

16  Company's stock option plans, including the review and grant of

17  stock options to officers and other employees under the Company's

18  stock option plans. The Compensation Committee also reviews and

19  approves various other compensation policies and matters, and

20  reviews and approves salaries and other matters relating to

21  compensation of the executive officers of the Company.

22  16.  Defendant Richard A. Brenner ("Brenner") is, and at all times relevant to

23  the allegations raised herein was, a director, and has been since 1998.

24  According to the Company's FY:02 Proxy Statement, as of November 8,

25  2002, defendant Brenner owned or controlled 45,636 shares of Blue Rhino.

26  Also, as a non-employee director of the Company, defendant Brenner

27  receives an option to purchase 12,000 shares of common stock of the

28

- 12 -
SHAREHOLDER DERIVATIVE COMPLAINT

1    Company the first business day after each annual meeting and an additional

2    option for 3,000 shares based on his participation on all three (3) of the

3    Company's board committees. In addition to his dominance and control

4    over Blue Rhino as a result of being a director, defendant Brenner also has

5    longstanding personal and professional entanglements and relationships

6    with other Board members which have prevented them and is preventing her

7    from acting independently to fulfill the fiduciary duties owed to Blue Rhino

8    and its shareholders, including the fact that:

9        a.    Defendant Brenner and defendant Prim are long-standing members of

10            the Winston-Salem business community. Defendants Brenner and

11            Prim both serve on the board of Southern Community Bank & Trust.

12            In addition, defendant Prim serves on the Board of Directors of

13            Brenner Children's Hospital & Health Services of the Wake Forest

14            University Baptist Medical Center. The Brenner Children's Hospital

15            is named after the family of defendant Richard A. Brenner;

16        b.    Defendant Brenner is Chairman of the Company's Audit Committee,

17            along with defendants Robert Lunn, David Warnock and John H.

18            Muehlstein. They were charged with, among other things, ensuring

19            that the Company had proper accounting procedures and controls in

20            place so as to guarantee that the Company was properly accounting

21            for its assets and ensuring that the Company's financial statements

22            presented an accurate representation of the Company's financial

23            position at all times during the Relevant Period, which they did not;

24
25        c.    Defendant Brenner was also a member of the Compensation

26            Committee, along with defendant Devick. They were charged with,

27            among other things, establishing the salary and incentive

28            compensation for the Company's Chief Executive Officer (defendant

- 13 -
SHAREHOLDER DERIVATIVE COMPLAINT

1    Prim). The Compensation Committee also administers the Company's

2    stock option plans, including the review and grant of stock options to

3    officers and other employees under the Company's stock option plans.

4    The Compensation Committee also reviews and approves various

5    other compensation policies and matters, and reviews and approves

6    salaries and other matters relating to compensation of the executive

7    officers of the Company.

8    d.    Defendant Brenner is a member of the Executive Committee (along

9    with defendants Prim and Filipowski). The Executive Committee

10   makes recommendations to the Board of Directors concerning matters

11   of strategic planning and operational management and has the power

12   to address matters on behalf of the Board.

13   17.  Defendant Robert Lunn ("Lunn") is, and at all times relevant to the

14   allegations raised herein was, a director of the Company, and has served in

15   this capacity since 1999. According to the Company's FY:02 Proxy

16   Statement, as of November 8, 2002, defendant Lunn owned or controlled

17   42,531 shares of Blue Rhino stock. Also, as a non-employee director of the

18   Company, defendant Brenner receives an option to purchase 12,000 shares

19   of common stock of the Company the first business day after each annual

20   meeting and an additional option for 1,000 shares based on his participation

21   on the Audit Committee. In addition to his dominance and control over

22   Blue Rhino as a result of his Board membership, defendant Lunn also has

23   longstanding personal and professional entanglements and relationships

24   with other Board members which have prevented them and is preventing

25   him from acting independently to fulfill the fiduciary duties owed to Blue

26   Rhino and its shareholders, including:

27

28

- 14 -

. 1         a.  Defendant Lunn is a member of the Company's Audit Committee, ·
2                  along with defendants Brenner, David Warnock and John H.
3                  Muehlstein. They were charged with, among other things, ensuring
4                  that the Company had proper accounting procedures and controls in
5                  place so as to guarantee that the Company was properly accounting
6                  for its assets and ensuring that the Company's financial statements
7                  presented an accurate representation of the Company's financial
8                  position at all times during the Relevant Period, which they did not;

9         b.  Defendant Lunn is the principal of Lunn Partners, an investment
10                  advisory firm that purchases shares of Blue Rhino stock for its
11                  clients;

12  18.  Defendant David Warnock ("Warnock") was at all times relevant to the
13  allegations raised herein, a director of the Company (since 2000).
14  According to the Company's FY:02 Proxy Statement, as of November 8,
15  2002, defendant Warnock owned or controlled 6,667 shares of Blue Rhino
16  stock. Also, as a non-employee director of the Company, defendant
17  Warnock receives an option to purchase 12,000 shares of common stock of
18  the Company the first business day after each annual meeting and an
19  additional option for 1,000 shares based on his participation on the Audit
20  Committee. In addition to his dominance and control over Blue Rhino as a
21  result of his stock ownership and position as a director of the Company,
22  defendant Warnock also has longstanding personal and professional
23  entanglements and relationships with other Board members, which have
24  prevented them and is preventing him from acting independently to fulfill
25  the fiduciary duties owed to Blue Rhino and its shareholders, including:
26
27         a.  Defendant Warnock is the General Partner of Camden Partners
28                  Strategic II, LLC (formerly known as Cahill, Warnock Strategic

- 15 -

1     Partners II, LLC). Camden Partners owns or controls over 1,611,140

2     shares of common stock of the Company, approximately 11% of all

3     outstanding common shares of the Company and, as such, has the

4     right to designate a board member, in this case defendant Warnock;

5     b.   Defendant Warnock is a member of the Company's Audit Committee,

6     along with defendants Brenner, Lunn and John H. Muehlstein. They

7     were charged with, among other things, ensuring that the Company

8     had proper accounting procedures and controls in place so as to

9     guarantee that the Company was properly accounting for its assets

10     and ensuring that the Company's financial statements presented an

11     accurate representation of the Company's financial position at all

12     times during the Relevant Period, which they did not.

13   19.   Defendant John H. Muehlstein ("Muehlstein") is, and was at times relevant

14     to the allegations raised a longstanding director of the Company (since

15     1995). According to the Company's FY:02 Proxy Statement, as of

16     November 8, 2002, defendant Muehlstein owned or controlled 26,448

17     shares of Blue Rhino stock. Also, as a non-employee director of the

18     Company, defendant Brenner receives an option to purchase 12,000 shares

19     of common stock of the Company the first business day after each annual

20     meeting and an additional option for 1,000 shares based on his participation

21     on the Audit Committee. In addition to his dominance and control over

22     Blue Rhino as a result of his stock ownership and position as a director of

23     the Company, defendant Muehlstein also has longstanding personal and

24     professional entanglements and relationships with other Board members,

25     which have prevented them and is preventing him from acting

26     independently to fulfill the fiduciary duties owed to Blue Rhino and its

27     shareholders, including:

28

1     a.  Defendant Muehlstein is a member of the Company's Audit
2         Committee, along with defendants Brenner, Lunn and Warnock.
3         They were charged with, among other things, ensuring that the
4         Company had proper accounting procedures and controls in place so
5         as to guarantee that the Company was properly accounting for its
6         assets and ensuring that the Company's financial statements presented
7         an accurate representation of the Company's financial position at all
8         times during the Relevant Period, which they did not.

9     b.  Defendant Muehlstein is the managing partner of the law firm of
10        Pedersen & Houpt, P.C. During fiscal 2002, defendant Muehlstein's
11        law firm was paid $67,956 by the Company for legal work performed
12        on behalf of Blue Rhino.

13  20.  Defendant Tim Scronce ("Scronce") is, and at all times relevant to the
14       allegations raised herein, was Chief Operating Officer of the Company. As
15       of November 2002, defendant Scronce was named President of the
16       Company. According to the Company's FY:02 Proxy Statement, as of
17       November 8, 2002, Scronce owned or controlled over 24,010 shares of Blue
18       Rhino stock. In exchange for his purported loyalty and fidelity, defendant
19       Scronce received the following very significant compensation package from
20       Blue Rhino during FY:02: salary – $175,846; bonus – $99,804; other
21       compensation - $94,412, as well as the option to purchase 100,000 shares of
22       Blue Rhino stock.

23  21.  The defendants named in ¶¶ 12-19 are sometimes collectively referred to
24       herein as the "Director Defendants." The defendants named in ¶¶ 12-20 are
25       sometimes collectively referred to herein as the "Individual Defendants."

27  22.  According to Blue Rhino's FY:02 Proxy Statement, non-employee directors
28       were also well compensated to assure their allegiance to the Company and

- 17 -
SHAREHOLDER DERIVATIVE COMPLAINT

1  its shareholders. Pursuant to Blue Rhino's FY:02 Proxy Statement; upon
2  the conclusion of each of the Company's annual stockholders' meetings,
3  each continuing non-employee director is automatically granted an option of
4  12,000 shares of the Company's common stock. Directors who serve on
5  committees receive an additional option to purchase 1,000 shares.

6  23.  The Individual Defendants owed the Company and its public shareholders
7  the duty to exercise a high degree of due care, loyalty, and diligence in the
8  management and administration of the affairs of the Company, as well as in
9  the use and preservation of its property and assets. The conduct of
10  defendants complained of herein involves a knowing and culpable violation
11  of their obligations as directors and/or officers of Blue Rhino, the absence
12  of good faith on their part, and a reckless disregard for their duties to the
13  Company and its shareholders, which the defendants were aware or should
14  have been aware posed a risk of serious injury to the Company.

15  24.  Notwithstanding their positions of trust and fidelity, and in violation of
16  California law, during the period between August 20, 2002 and December 3,
17  2002 while in the possession of materially adverse non-public information
18  regarding Blue Rhino, certain defendants and entities controlled by certain
19  defendants, either sold or acquiesced in and/or permitted the sale of
20  significant amounts of Company stock by the officers and/or insiders of the
21  Company, in the amounts indicated below:

| NAME | DATE | SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|---|
| **Lunn** | 09/20/02 | 17,734 | $14.116 | $ 250,333.00 |
| | 12/03/02 | 2,000 | $18.00 | 36,000.00 |
| **Warnock** | 12/02/02 - 12/03/02 | 75,000 | $17.94 - 19.69 | 1,411,000.00 |

- 18 -
SHAREHOLDER DERIVATIVE COMPLAINT

| Warnock/ Camden Partners Str. Fund | 12/02/02- 12/03/02 | 72,750 | $17.94 - 19.69 | $1,369,000.00 |
|---|---|---|---|---|
| Warnock/ Cahill Warnock SPFLP | 12/02/02- 12/03/02 | 2,250 | $17.94 | $40,369.00 |
| **TOTAL** | | **169,734** | | **$3,106,702.00** |

25. In contrast to the actions taken by defendants as alleged herein, including the sale of millions of dollars worth of their Blue Rhino shares while in possession of material adverse information, to properly discharge the aforesaid duties, defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of the Company pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position. The Individual Defendants were required, among other things:

a. To, in good faith, manage, conduct, supervise and direct the business and affairs of Blue Rhino carefully and prudently and in accordance with the laws of whichever state controls its "internal affairs," the laws of the United States and the rules and regulations and the charter and by-laws of Blue Rhino;

b. To neither violate nor knowingly permit any officer, director or employee of Blue Rhino to violate applicable federal and state laws, rules and regulations or any rule or regulation of Blue Rhino;

- 19 -

SHAREHOLDER DERIVATIVE COMPLAINT

| | | |
|---|---|---|
| 1 | c. | To exercise reasonable control and supervision over the public |
| 2 | | statements to the securities markets and trading in Blue Rhino stock |
| 3 | | by the officers and employees of Blue Rhino; |
| 4 | d. | To remain informed as to the status of Blue Rhino's operations, and |
| 5 | | upon receipt of notice or information of imprudent or unsound |
| 6 | | practices, to make a reasonable inquiry in connection therewith, and |
| 7 | | to take steps to correct such conditions or practices and make such |
| 8 | | disclosures as are necessary to comply with the federal securities |
| 9 | | laws; |

10   e.   To supervise the preparation, filing and/or dissemination of any SEC
11        filings, press releases, audits, reports or other information required by
12        law, to examine and evaluate any reports or examinations, audits, or
13        other financial information concerning the financial condition of Blue
14        Rhino and to cause Blue Rhino to obey and comply with and not
15        violate the federal or state securities laws;
16
17   f.   To ensure that Blue Rhino was operated in a diligent, honest and
18        prudent manner in compliance with all applicable federal and state
19        laws, rules and regulations;
20   g.   To maintain and implement an adequate system of controls and
21        information systems, such that no officer, director or employee of the
22        Corporation would make false statements about Blue Rhino to the
23        securities markets or would be able to misappropriate internal
24        confidential information for his or her own benefit and profit, by
25        insider stock trading or otherwise; and
26   h.   To ensure that the Company's financial statements were prepared in
27        accordance with Generally Accepted Accounting Principles
28        ("GAAP").

- 20 -
SHAREHOLDER DERIVATIVE COMPLAINT

26. The Individual Defendants, particularly the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for Blue Rhino and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

    a.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    b.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        i.    transactions are executed in accordance with management's general of specific authorization;

        ii.    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

27. Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

////

- 21 -
SHAREHOLDER DERIVATIVE COMPLAINT

1  28.  According to SAS 55.13:

2      Establishing and maintaining an internal control structure is an
3      important management responsibility. To provide reasonable
       assurance that an entity's objectives will be achieved, the internal
4      control structure should be under ongoing supervision by
       management to determine that it is operating as intended and that it is
5      modified as appropriate for changes in conditions."

6  29.  Blue Rhino's Audit Committee Charter applicable during the relevant

7      period of time provided, *inter alia*:

8      The Audit Committee shall provide assistance to the Board of
9      Directors in fulfilling their oversight responsibility to the
       shareholders, potential shareholders, the investment community, and
10     others relating to the Company's financial statements and the financial
       reporting process, the systems of internal accounting and financial
11     controls, the internal audit function (if applicable), the annual
       independent audit of the Company's financial statements, and the
12     legal compliance and ethics programs as established by management
       and the Board of Directors. In so doing, it is the responsibility of the
13     Audit Committee to maintain free and open communication between
       the committee, the independent auditors, the internal auditors and
14     management of the Company.
                                    * * *
15     The primary responsibility of the Audit Committee is to oversee the
16     Company's financial reporting process on behalf of the Board of
       Directors and report the results of their activities. Management is
17     responsible for preparing the Company's financial statements, and the
       independent auditors are responsible for auditing those financial
18     statements. In carrying out its responsibilities, the Audit Committee
       believes its policies and procedures should remain flexible in order to
19     best react to changing conditions and circumstances. The Audit
       Committee should take the appropriate actions to set the overall
20     corporate "tone" for quality financial reporting, sound business risk
       practices, and ethical behavior.

21

22  30.  Moreover, the Audit Committee Charter required that members of the Audit
23      Committee be independent. According to the very rules set forth by
24      defendants, a board member is considered independent if they have no
25      relationship that may interfere with the exercise of their independence from
26      management and the Company. Clearly, as set forth herein, defendants
27      Brenner, Lunn, Warnock and Muehlstein were inextricably intertwined
28

- 22 -
SHAREHOLDER DERIVATIVE COMPLAINT

1    with the other defendants such that the requisite independence was not
2    possible.

3  31.  Interestingly, in September 2003, defendants caused the Company to amend
4       the Audit Committee Charter in an apparent effort to dilute the
5       responsibilities of the Audit Committee by stating, *inter alia*, that the Audit
6       Committee "serves a board oversight role where it oversees the relationship
7       with the independent auditor . . . and provides advice, counsel and general
8       direction, as it deems appropriate, to management and the auditors on th
9       basis of information it receives, discussions with the auditor, and the
10      experience of the Committee's members in business, financial and
11      accounting matters."

12 32.  As alleged in detail below, the Individual Defendants, particularly the
13      members of the  Audit Committee, failed to implement and maintain an
14      adequate internal accounting control system for Blue Rhino, and thereby
15      violated: (i) their fiduciary duties of loyalty and good faith; (ii) GAAP; and
16      (iii) the  Audit Committee Charter.

17 33.  The Individual Defendants further breached their duties of loyalty and good
18      faith by: (i) causing or allowing the Company to conduct its business in an
19      unsafe, imprudent, and unlawful manner; and (ii) causing the Company to
20      suffer damages, as alleged herein.

21 34.  Defendants, as corporate officers and/or directors, owed Blue Rhino and its
22      shareholders the duty of due care in the performance of their responsibilities
23      with respect to Blue Rhino's operations.  Each defendant in this action,
24      individually or jointly, as hereinbefore alleged, failed to exercise reasonable
25      diligence and due care, was grossly negligent or reckless, and committed
26      one or more of the following actions or omissions constituting breaches of
27      fiduciary duty:

28

SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4

    •    Defendants Lunn and Warnock, as well as two entities in which defendant Warnock has a controlling interest, with the acquiescence, authority and/or permission of the Board, misused proprietary non-public corporate information to profit by over $3.1 million by insider selling the Company's stock in violation of Company policies and rules against such misuse of information or sales and in violation of federal and state laws as well;

5
6
7

    •    Defendants authorized, caused or permitted Blue Rhino to conduct its business in an unsafe, imprudent and dangerous manner by pursuing unsound practices, including concealing the true nature of their reckless, unsafe and unsound accounting practices and the serious adverse impact of these practices on Blue Rhino's financial condition and prospects;

8
9
10

    •    Defendants authorized, caused or permitted Blue Rhino to operate and report information in a manner which was contrary to federal and state regulations, thus exposing it to liability for violation of the federal securities laws for which the Company has been sued in a class action in federal court in California; and

11
12
13
14
15
16

    •    Defendants' conduct as alleged herein has also damaged Blue Rhino by exposing it to the cost of the defense of and possible cost of liability for violation of the federal securities laws as a result of the securities class action lawsuits now pending against it in federal court, damage to the goodwill and reputation of Blue Rhino due to the negative adverse publicity that their actions have generated, and they have impaired Blue Rhino's ability to raise capital at a reasonable and/or low cost as the Corporation's credit rating has been adversely affected, and its cost of capital has therefore increased, to the harm of the Corporation.

17    35.    By reason of their corporate positions and their ability to control the

18    business and corporate affairs of Blue Rhino at all relevant times,

19    defendants owed Blue Rhino and its stockholders fiduciary obligations of

20    candor, fidelity, trust, and loyalty, and are and were required to use their

21    ability to control Blue Rhino in a fair, just and equitable manner, as well as

22    to act in furtherance of the best interests of Blue Rhino and its stockholders

23    and not in furtherance of their own personal interests. In addition, each

24    director owed Blue Rhino, while he or she occupied such directorship, the

25    fiduciary duty to exercise due care and diligence in the management and

26    administration of the affairs of Blue Rhino and in the use and preservation

27    of its property and assets. In violation of their fiduciary duties, defendants

28    permitted and/or caused Blue Rhino to conduct its business in an unsafe,

1       imprudent and dangerous manner by violating the federal securities laws ·

2       and permitting certain insiders to misappropriate and misuse confidential

3       non-public corporate information for their personal profit.

4  36.  Defendants participated in the wrongdoing complained of herein in order to

5       improperly benefit themselves by remaining as officers and/or directors of a

6       large corporation and to continue and prolong the illusion of the Company's

7       success, to inflate the price of its common stock, and to conceal the adverse

8       facts concerning defendants' wrongful conduct, and Blue Rhino's

9       management, financial position and future prospects so that they could: (a)

10      protect and perpetuate their directorial and/or executive positions and

11      increase the substantial compensation, perks and prestige they obtained

12      thereby; and (b) inflate the price of the Company's common stock in order to

13      enhance the value of their securities holdings and options to purchase Blue

14      Rhino stock and to allow certain insiders to liquidate approximately \$3.1

15      million of Blue Rhino stock, while in possession of material adverse non-

16      public information. Such participation involved, among other things,

17      planning and creating (or causing to be planned and created), proposing (or

18      causing the proposal of) and authorizing, approving and acquiescing in the

19      conduct complained of herein.

20  37.  As members of the Board of Directors of Blue Rhino, the directors named

21      herein as defendants were themselves directly responsible for authorizing or

22      permitting the authorization of, or failing to monitor, the practices which

23      resulted in the misappropriation of confidential corporate information and

24      violation of the federal securities laws as alleged herein. Each of them had

25      knowledge of and actively participated in and approved of the wrongdoings

26      alleged or abdicated his or her responsibilities with respect to these

27      wrongdoings. The alleged acts of wrongdoing subjected Blue Rhino to

28      unreasonable risks of loss.

1  38.  By reason of their membership on the Blue Rhino Board of Directors and

2     positions as executive officers of the Company, the defendants were each

3     controlling persons of Blue Rhino and had the power and influence to

4     cause, and did cause, the Company to engage in and/or permit the conduct

5     complained of herein.

6                    **Substantive Allegations**

7  39.  Blue Rhino purports to be a leading national provider of propane gas and

8     propane gas accessories, including a national branded propane cylinder

9     exchange and a complementary products division. The Company's stock is

10    quoted on the Nasdaq National Market under the symbol RINO.

11 40.  On August 15, 2002, defendants caused Blue Rhino to issue a press release

12    announcing that the Company had beat prior earnings guidance, and raised

13    estimates for its fiscal year 2002, stating also that Blue Rhino's business was

14    stronger than ever and that the Company was poised for success, as follows:

15
   Blue Rhino Expects Fiscal-Year Earnings to Exceed Estimates
16 The better-than-expected results are largely due to
   ***stronger-than-anticipated demand for Blue Rhino's cylinder***
17 ***exchange services***, which drove fiscal-year revenue above $200
   million. The expected increase of more than 40% from $138 million
18 in the prior fiscal year exceeds the high end of previous guidance.
                     *      *      *

19    "Our preliminary results demonstrate the consumers' strong appetite
   for the convenience of our cylinder exchange program, combined
20 with the commitment of our retail customers and ***the ability of our***
   ***distributors and employees to execute on our business plan***," said
21 Billy D. Prim, chairman and chief executive officer. "***We see***
   ***consumer demand for our exchange service being stimulated by the***
22 ***new fire safety standard that requires overfill protection valves on***
   ***all 20 lb. propane cylinders***. Our Blue Rhino exchange service is a
23 convenient, safe solution to replacing cylinders that have been made
   obsolete by this new safety standard, and our research suggests that
24 we will retain at least 80 percent of new customers who try our
   service. ***We expect the new safety standards will continue to impact***
25 ***our results over the next 18 to 24 months as consumers continue to***
   ***replace obsolete cylinders***." [Emphasis added.]

26
27 41.  After the issuance of the Company's August 15, 2002 release, shares of Blue

28    Rhino common stock surged almost 15% in intra-day trading, trading to a

| | |
|---|---|
| 1 | high of \$12.95 per share on August 15, 2002, compared to the prior day's |
| 2 | close of \$11.30 per share. Unknown to investors, however, the statements |
| 3 | contained in this release were materially false and misleading and were |
| 4 | known by Defendants to be false at the time of publication, or were |
| 5 | recklessly disregarded as such thereby, for the following reasons, among |
| 6 | others: |

7    1.    While Defendants claimed that business was strong and was expected
8          to continue as such in the foreseeable future, Defendants knew or
9          recklessly disregarded the fact that at least the two largest of the
10         Company's distributors were performing so far below plan that Blue
11         Rhino was planning to acquire them;

12   2.    The two failing distributors, Ark and Platinum, accountable for at
13         least 40% of the Company's distribution, had lost over \$2.8 million on
14         a combined basis for the first 10 months of fiscal 2002, compared to a
15         loss of only \$1.2 million for all of fiscal 2001;

16   3.    Platinum had performed so poorly for the year that it was actually in
17         violation of its loan covenants on its credit line with Southern
18         Community Bank, including the requirement that Platinum have a
19         minimum net wort of \$550,000.00 as of December 31, 2001. In fact,
20         as of December 31, 2001, Ark and Platinum had a combined net
21         worth of negative \$5.1 million;

22   4.    Ark and Platinum already owed Blue Rhino at least \$5 million in cash
23         advances and an additional \$2.8 million in debt, representing 61% of
24         their total liabilities, which money Blue Rhino was at risk of losing if
25         these distributors failed completely;

26   5.    That Defendants had misrepresented that the purchase price of the
27         acquisitions of the distributors only totaled \$21 million when, in fact,
28         the true price of the acquisition was \$32 million ; and

SHAREHOLDER DERIVATIVE COMPLAINT

1        6.    Contrary to Defendants' statements that overfill prevention device ·

2            regulations ("OPD Regulations") were continuing to result in robust

3            demand for Blue Rhino products, Defendants were already beginning

4            to see the end of the positive impact of the OPD Regulation, such that

5            they  lacked a reasonable basis to claim that demand would

6            foreseeably continue to remain at then current levels, and lacked a

7            reasonable basis not to adjust downward estimates at this time.

8   42.   On September 17, 2002, defendants caused Blue Rhino to publish another

9       press release announcing "record" results for the fourth fiscal quarter and

10     full fiscal year 2002, the period ended July 31, 2002.  In addition,

11     defendants also used this release to announce Blue Rhino's intention to

12     acquire certain of its distributors, and stated, in part, the following:

> Blue Rhino Corporation... today announced financial results for the fourth quarter and fiscal year ended July 31, 2002.  Net revenues for the fourth quarter increased 72 percent to a record $71.3 million from $41.6 million for the same period a year ago.  Revenues from the company's cylinder exchange business rose 81 percent, and revenues from its complementary propane-fueled products business increased 32 percent.  Cylinder exchange represented approximately 85 percent of total revenue, compared with 80 percent a year ago, while products were approximately 15 percent of total revenue, compared with 20 percent in the prior year.
>
>           *    *    *
>
> Commenting on the results, [defendant] Prim said: "***The fourth-quarter performance demonstrates that we continued to execute our plan to leverage our industry leadership by capitalizing on the growing trend in consumer preference for cylinder exchange over refill, using our extensive retail relationships to cross merchandise our complementary propane-related products, and leveraging our established infrastructure which we believe is the most advanced and efficient direct-store delivery system servicing retailers today.***"
>
>           *    *    *
>
> Prim continued, "***We currently anticipate double-digit growth in the number of cylinders transacted for at least the next three fiscal years***, which will help continue to drive revenue growth."
>
>    "Cylinder exchange has benefitted from the new National Fire Protection Association guidelines that went into effect April 1 mandating that all cylinders be equipped with an Overfill Protection Device (OPD) before they can be refilled," Prim said.  "***We expect these guidelines to continue to impact our results for the next 18 to***

1     *24 months. The OPD requirement prompts consumers to try*
2     *cylinder exchange, and our studies suggest that at least 80 percent*
    *of those trying cylinder exchange stick with it.*"
         * * *

3     [Defendant Prim stated, in part, that,] "Sales of propane-fueled
products serve to strengthen our core cylinder-exchange business
4     through recurring sales of propane cylinders to fuel the products. Our
growth strategy includes continuing to expand our propane-fueled
5     products business to leverage our extensive retail relationships."

6 Regarding the acquisition of its nine distributors – which Defendants stated were

7 expected to further improve operating results – this release also stated the

8 following:

9     *Blue Rhino also announced that it has reached agreement in*
*principle on the financial terms on which it would acquire nine*
10     *distributors in major metropolitan areas across the United States....*
If the acquisitions are completed, Blue Rhino would control
11     distribution territories *responsible for approximately 45 percent of*
*its current cylinder exchange revenues.*
12     "The strategic acquisition of these distributors would provide Blue
Rhino more control over our enterprise that we believe will *enable us*
13     *to further improve operating results and to increase stockholder*
*value,*" said Prim. "We currently intend to continue to partner with
14     independent distributors in many markets where the distributor model
remains the most efficient means of serving our retail customers."
15
In addition to the foregoing, this release also provided purported "Guidance for
16
Fiscal 2003," as follows:
17
    "*Looking forward to fiscal year 2003, we continue to expect strong*
18     *growth in the recurring cylinder exchange business,*" Prim said.
"We believe Blue Rhino is well positioned to continue to benefit from
19     the safety initiative that went into effect in April, since cylinder
exchange represents the simplest way for consumers to upgrade their
20     cylinders...."
         * * *
21
    *For the fiscal year ending July 31, 2003, Blue Rhino currently*
22     *expects revenues of $240 million to $245 million, resulting in*
*earnings per share of $0.85 to $0.88* and EBITDA of $29 million to
23     $30 million. The mix of revenues for the full year is expected to be
approximately 60% from cylinder exchange and 40% from products.
24
43.    In addition to the foregoing, at the time the Ark and Platinum acquisitions
25
were announced, Defendants stated and/or provided the following guidance:
26
That, while the full terms of the distributor acquisition were not made
27 known, at the time the distribution acquisition was announced
defendants told investors that the acquisitions would be paid for with
28 stock and assumed debt *valued at approximately $21 million;*

- 29 -

1    *including the issuance of 1.1 million shares of common stock plus
     $2.5 million in cash.*

2    That, the estimated purchase price of $21 million was approximately
     5x-6x EBITDA for the acquisitions.

3    That, the primary purpose of the acquisitions was to increase the
     Company's control over its distribution channel.

4    That, at the time the acquisition was announced, Ark and Platinum
     were strong, healthy, highly profitable and independent of Blue

5    Rhino.
     That, since both Ark Propane and Platinum Propane were holding

6    companies originally founded by the Company's CEO and Vice
     Chairman in the early 1990's, yet which were fully divested several

7    years prior to the acquisitions, management of Blue Rhino was very
     familiar with these companies and that their integration would

8    foreseeably be seamless.

9    44.   On November 21, 2002, defendants caused the Company to publish a

10   release announcing that it had completed a new $60 million credit facility at

11   a reduced interest rate from its pre-existing $41.5 million facility that would

12   have expired on August 1, 2003. Participating banks included LaSalle Bank

13   National Association, RBC Centura Bank, and SunTrust Bank. The new

14   credit facility purportedly consisted of a $45 million revolving loan and a

15   $15 million term loan, both for general corporate purposes. As compared to

16   the Company's current facility, the new facility extended expiration to

17   November 2005 and reduced interest rates 25 basis points. According to

18   defendant Castaneda:

19          This new bank facility, "illustrates the confidence
            lending institutions have in our future business and
20          reflects improvement in our credit quality driven by our
            operating results. The facility, which was increased due
21          to strong demand from the lenders by $10 million from
            the $50 million facility that we originally were seeking,
22          should continue to reduce our interest costs while
            providing more flexibility to execute our growth plan."

23   45.   Announcing a reduction in the Company's interest rate also had the effect of

24   causing shares of Blue Rhino to rise, and on November 21, 2002, shares of

25   Blue Rhino closed at $16.22 per share. Unknown to investors, however, the

26   statements contained in this release were materially false and misleading

27   and were known by Defendants to be false at the time of publication, or

28

- 30 -
SHAREHOLDER DERIVATIVE COMPLAINT

1  were recklessly disregarded as such thereby, for the reasons stated herein in

2  *supra.* In addition, such statements were also materially false and

3  misleading, because defendants knew the Company did not have enough

4  cash from operations to remain fully funded, so that the Company would

5  have to engage in other financing, under the guise of repaying debt, to

6  remain fully funded.

7  46.  On or about November 22, 2002, the Company filed with the SEC its yearly

8  Proxy Statement. In this SEC filing, it was reported that the Board of the

9  Company had given defendant Prim a 53% increase in his base salary for

10  fiscal year 2003 – bumping him up to $595,000 per year, compared to his

11  prior base salary of $388,000 the prior year.

12  47.  On November 25, 2002, defendants caused the Company to publish a

13  release announcing that Blue Rhino had completed the acquisition of its

14  distributors, as follows:

15      Blue Rhino... today announced the acquisition of ten of
        its distributors in major metropolitan areas across the
16      United States. The territories served by the distributors
        acquired *represent approximately 45 percent of Blue*
17      *Rhino's cylinder exchange revenues*.
                          *   *   *
18      "*These distributors have reached critical mass and we*
        *have also added the management talent to allow us to*
19      *effectively run the operations.* Our acquisition of these
        distributors in major markets will provide us more
20      control over our enterprise, which we believe will *enable*
        *us to improve operating results and increase*
21      *stockholder value...*," added [defendant] Prim.
        *Blue Rhino currently expects the acquisitions to be*
22      *accretive to future earnings for the remainder of fiscal*
        *2003 by between $0.01 and $0.03 per diluted share,*
23      *weighted primarily in the fourth fiscal quarter, and*
        *thereafter on an annualized basis by between $0.02 and*
24      *$0.04 per diluted share, and to be accretive to earnings*
        before interest, depreciation and amortization (EBITDA)
25      *by approximately $2.9 million in fiscal 2003 and*
        *thereafter by approximately $3.5 million annually.*
26      Blue Rhino also currently expects the acquisitions to
        have an approximately *$2 million negative impact on*
27      *annual revenues* as a result of the elimination of lease
        revenues to the distributors.

28

- 31 -
SHAREHOLDER DERIVATIVE COMPLAINT

1

*The consideration paid by Blue Rhino in the
acquisitions consisted of 1,104,196 restricted shares of
Blue Rhino's common stock, valued at approximately
$17 million based on a thirty-day pricing period ending
on November 1, 2002, and approximately $3,331,172 in
assumed debt satisfied at closing.*
The distributors purchased include Platinum Propane,
L.L.C. and five distributors owned by it, with operations
in Southern California, including Los Angeles and San
Diego, Chicago, the Carolinas, Georgia and Florida. The
remaining five distributors were owned by Ark Holding
Company, L.L.C. with operations in New Jersey, Seattle,
Kansas City, Denver and Salt Lake City.

The operational management will be retained.

*"We expect greater leverage in operating margins as
our distributors continue to benefit from strong
same-store sales growth, which reduces operating costs
per unit. "We expect little integration risk as we are
using the same operational management and same
transactional technology,"* added Prim. [Emphasis
added.]

48. News of the closing of these acquisitions also caused shares of the Company

to rise, and Blue Rhino stock closed at $17.50 on November 26, 2002.

Within three days, shares of Blue Rhino traded above $19.00. Unknown to

investors, however, the statements contained in this release were materially

false and misleading and were known by Defendants to be false at the time

of publication, or were recklessly disregarded as such thereby, for the

reasons stated herein in ¶ 41(a)-(f), *supra*.

49. On November 26, 2002, defendants caused the Company to publish a

release announcing "record" results for the first quarter of fiscal 2003, the

period September 31, 2002, as follows:

Blue Rhino Corporation ... today announced that *first-quarter net
income rose more than eleven-fold on a 50% rise in revenues from
a year ago*, as the company continued to experience strong demand
for cylinder exchange.
For the fiscal first quarter ended October 31, 2002, Blue Rhino
reported net income of $1.2 million, or $0.07 per fully diluted share,
on record revenues of $54.8 million. This compared with net income
of $107,000, or $0.01 per share, on revenues of $36.5 million for the
same period a year ago....

- 32 -
SHAREHOLDER DERIVATIVE COMPLAINT

1    *"We continued to execute our growth plan during the fiscal first quarter," said [defendant] Prim. "We are well positioned to*
2    *leverage our industry leadership* by capitalizing on the growing trend in consumer preference for cylinder exchange over refill using
3    our extensive retail relationships to cross-merchandise our complementary propane-related products, and leveraging our
4    established infrastructure which we believe is the most advanced and efficient direct-store delivery system servicing retailers today."

5    "*The trend toward cylinder exchange continues to be fueled by a*
6    *combination of factors that we believe bode well for us," Prim said.*
     *"These include the adoption in many states of National Fire*
7    *Protection Association guidelines mandating the installation of an*
     *overfill prevention device on all cylinders refilled after April 1,*
8    *2002*, as well as support by large retailers seeking to make the purchase of propane-fueled barbecue grills and other products
9    convenient to their customers by promoting the availability of a full cylinder at the time of purchase."
10                            *        *        *

     Guidance Raised for Fiscal 2003
11
     *"The acquisition of certain distributors and continued growth*
12   *ahead of our expectations in the recurring cylinder exchange*
     *business allowed us to increase our guidance for the remainder of*
13   *the fiscal year,"* Prim said. For the fiscal second quarter ending
     January 31, 2003, Blue Rhino currently expects revenues in the range
14   of $40 million to $45 million, resulting in break-even earnings and
     EBITDA of between $3.4 million to $3.6 million.
15
     For the fiscal year ending July 31, 2003, *the company is raising*
16   *guidance to reflect continued strong cylinder exchange results and*
     *the projected impact of the acquisition of certain distributors.* Blue
17   Rhino currently expects revenues in the range of $250 million to $255
     million, resulting in earnings per share between $0.91 to $0.94 and
18   EBITDA of between $32 million to $35 million.

19   50.   Following the publication of these results, Defendants also hosted a

20         conference call during which defendant Prim stated, "*we believe this is*

21         *another verification that our strategies are sound and are working."*

22   51.   The statements contained in the November 26, 2002, Blue Rhino release

23         were materially false and misleading and were known by Defendants to be

24         false at the time of publication, or were recklessly disregarded as such

25         thereby, for the reasons stated herein in ¶ 41(a)-(f), *supra*.

26   52.   Significantly, on December 2, 2002 and December 3, 2003, defendants

27         Lunn and Warnock, along with certain entities controlled by defendant

28

                              - 33 -

| | | |
|---|---|---|
| 1 | | Warnock, sold 152,000 shares of Blue Rhino stock to garner over $2.85 · |
| 2 | | million dollars in illicit insider trading proceeds. |
| 3 | 53. | On December 20, 2002, defendants caused the Company to publish a release |
| 4 | | announcing that Blue Rhino had completed the sale of one million shares |
| 5 | | valued at a price of $15.79 per share – plus rights to acquire an additional |
| 6 | | 330,000 shares at the same price within 90 days – valued at over $5 million. |
| 7 | | According to the Company's release, *"the net proceeds from the financing* |
| 8 | | *will be used to satisfy the Company's existing subordinated debt, which* |
| 9 | | *currently bears a 13 percent interest rate.*" |
| 10 | 54. | Defendants' announcement that the Company had issued private equities |
| 11 | | and that it would use the $15 million cash infusion to reduce debt had a |
| 12 | | positive effect on the Company, and its share price. Defendants' statements, |
| 13 | | however, were materially false and misleading because the Company did |
| 14 | | not have enough cash from operations to remain fully funded, so that the |
| 15 | | Company would not use this money to pay down existing debt, but rather to |
| 16 | | fund existing operations and help infuse cash into its money-losing |
| 17 | | acquisitions. |
| 18 | 55. | On January 7, 2003, Dow Jones reported that Blue Rhino had registered for |
| 19 | | sale over 1.3 million shares of common stock on behalf of two shareholders, |
| 20 | | the majority of which had been issued just weeks before in the private |
| 21 | | placement referenced above. Apparently, these two shareholders (Mainfield |
| 22 | | Enterprises, Inc. (798,000 shares) and Smithfield Fiduciary, LLC (532,000 |
| 23 | | shares)) demanded the sale of their Blue Rhino shares before the revelation |
| 24 | | of defendants' fraud. |
| 25 | | **The Truth is Revealed** |
| 26 | 56. | On or about February 5, 2003, the Company shocked investors when it filed |
| 27 | | with the SEC, pursuant to Form 8-K, its combined balance sheet, which |
| 28 | | |

1    accounted for the recently completed acquisitions of Platinum Propane

2    Holdings and Ark Holdings, and stated, in part, the following:

3    The closing date for the acquisitions of Platinum Propane, L.L.C. and
     Ark Holding Company LLC and their respective subsidiaries by Blue
4    Rhino was November 22, 2002. *The aggregate purchase price for*
     *the two acquisitions was approximately $32 million.* The
5    consideration paid by Blue Rhino in the two acquisitions consisted of
     approximately *1.1 million restricted shares of common stock valued,*
6    *based on the closing price of Blue Rhino's common stock on the*
     *Nasdaq National Market on November 22, 2002, at approximately*
7    *$19 million, $3.1 million in assumed debt satisfied at closing,*
     *$4.9 million in advances, and $5.0 million in liabilities assumed*....
8    Under the purchase method of accounting, the purchase price is
     allocated to the assets acquired and liabilities assumed based on their
9    respective fair values. On a preliminary basis, *approximately $28.2*
     *million of the purchase price was allocated to goodwill*, with the
10   balance allocated to equipment, vehicles and other assets. The
     allocation of the aggregate purchase price to the assets and liabilities
11   acquired is based upon their estimated fair values. The allocation of
     the aggregate purchase price reflected in the pro forma financial
12   information is preliminary. The final allocation of the purchase price
     is not expected to differ materially from the preliminary allocation.

13   57.  Additionally, the Defendants caused the Company to report, in its unaudited

14        pro forma statement, that the distributors had a net loss of $2.8 million,

15        which was drastically different than what had been represented by the

16        Defendants in the Company's November 25, 2003 press release.

17        Furthermore, Defendants caused the Company to report that Platinum was

18        in violation of its debt covenants and that the distributors owed Blue Rhino

19        $5 million in cash advances in addition to the current debt of $2.8 million.

20   58.  While the Company had made no public disclosures that would explain the

21        decline in the price of Blue Rhino stock prior to this time, following the

22        publication of the Company's Form 8-K, the next day, February 5, 2003,

23        shares of Blue Rhino traded below $12.50, and the following day, as

24        investors further digested this information, shares of the Company traded

25        even lower, falling to a low of $9.65 on February 7, 2003. This material

26        decline in the price of Blue Rhino shares, caused a loss of over 50% from a

27        high of $20.75 reached only weeks before.

28

- 35 -

1    59.    During the rapid decline in the price of Blue Rhino shares, on February 6,

2           2003, defendants were forced to have the Company publish a release

3           purporting to provide an explanation for the "unusual trading" surrounding

4           its stock, by claiming that there was no reason for this sudden price decline,

5           as follows:

6           Blue Rhino Corporation ... *today commented on the unusual trading*
            *volume in its stock.*

7
            *"We are unaware of the reason for the recent volume of trading in*
8           *our stock*," stated [defendant] Prim. "We reaffirm our previous
            guidance for the fiscal year of revenues in the range of $250 million
9           to $255 million, resulting in earnings per share between $0.91 to
            $0.94 and EBITDA of between $32 million to $35 million, and
10          remain comfortable with the second quarter."

11   60.    On February 25, 2003, defendants caused Blue Rhino to publish a release

12          announcing results for the second fiscal quarter 2003, the period ended

13          June 31, 2003, and which stated, in part, the following:

14          Blue Rhino Corporation... today announced that net income increased
            to $916,000, or $0.05 per fully diluted share, for its fiscal second
15          quarter ended January 31, 2003, from a loss of ($732,000), or ($0.06)
            per fully diluted share, for the second quarter of last year.

16
            The increase was driven by revenues of $58.1 million, a record for the
17          second quarter and a 50% rise from revenues of $38.8 million in same
            period a year ago, as the company continued to experience
18          stronger-than-expected demand in its cylinder exchange segment.
            Earnings before interest, taxes, depreciation and amortization
19          (EBITDA) increased to $4.6 million from $3.7 million for the same
            period in the prior year. Blue Rhino's second quarter is historically its
20          slowest due to the seasonality of its propane cylinder exchange
            business..

21
     61.    Defendants materially misled the investing public, thereby inflating the
22
            price of Blue Rhino's common stock, by publicly issuing false and
23
            misleading statements and omitting to disclose material facts necessary to
24
            make Defendants' statements, as set forth herein, not false and misleading.
25
            Said statements and omissions were materially false and misleading in that
26
            they failed to disclose material adverse information and misrepresented the
27
            truth about the Company, its business and operations, as alleged herein.
28

- 36 -

## Members of the Audit Committee

## Abdicate Their Oversight Responsibilities.

62. Throughout 2002, the members of the Audit Committee, defendants Brenner, Lunn, Warnock and Muehlstein received or should have received numerous reports regarding the business affairs of the Company and the manner by which defendants were improperly recognizing revenue relating to software licenses. Indeed, in FY:02, the Audit Committee held three (3) meetings, yet it never took any action as the defendants caused the Company to issue false and misleading financial reports that failed to acknowledge the improper accounting procedures in place. If the defendants on the Audit Committee had been properly discharging their duties, they would have found the "red flags" which indicated that defendants were causing Blue Rhino to make false and misleading statements to the investing public including: (1) that certain distributors acquired by the Company on November 22, 2002 were not healthy, highly profitable, and independent of the Company, as portrayed by the Defendants. In fact, the distributors acquired by Blue Rhino had lost $2.8 million in the first ten (10) months of 2002 alone and owed Blue Rhino $5 million in cash advances in addition to the $2.8 million in debt. Also, one of the acquired distributors was in violation of its debt covenants for 2001; (2) defendants overstated the true value of Ark and Platinum, which had been artificially inflated and propped up with undisclosed loans guaranteed by defendants – which loans were paid and which guarantees were entirely wiped out by the acquisition of Ark and Platinum by Blue Rhino; (3) that Defendants misrepresented that the purchase price of the acquired distributors only totaled $21 million when in fact the true price of the acquisition was $32 million; (4) that the Company was beginning to see a decline in earnings from the Overfill Protection Device ("OPD")

1    regulations; (5) that the Company's earnings projections were lacking in any
2    reasonable basis when made; and (6) that the false and misleading
3    information disseminated by Defendants caused the Company stock to trade
4    at artificially inflated prices.

5  63.  In breach of both their fiduciary duty of good faith and their responsibilities
6    pursuant to the Audit Committee Charter, the members of the Audit
7    Committee wilfully ignored the obvious and pervasive problems with Blue
8    Rhino's accounting and revenue recognition practices. The members of the
9    Audit Committee made no effort to establish and maintain adequate internal
10    controls for the Company to ensure that the Company's financial results
11    were calculated and recorded in accordance with GAAP. Apparently
12    concerned with their failures in FY02 and their possible liability therefor,
13    the Audit Committee met fourteen (14) times in FY03. Nevertheless,
14    Plaintiff is not aware of any recommendation or action by the Audit
15    Committee against any of the defendants herein.

16  64.  The foregoing misconduct of defendants Brenner, Lunn, Warnock and
17    Muehlstein, caused Blue Rhino to suffer damages, including, but not limited
18    to, downgrading of the Company's credit ratings, loss of credibility in the
19    market and the necessity to defend various class action lawsuits pending in
20    federal court in California.

21

22                    **Illicit and Illegal Insider Trading**

23  65.  Defendants own significant amounts of Blue Rhino stock and/or hold
24    millions of vested options to purchase Blue Rhino stock. This huge equity
25    stake gave defendants a very strong motive to do everything they could to
26    keep Blue Rhino's stock price up, including the false and misleading
27    statements set forth in paragraphs 41(a)-(f), *supra*. These top insiders
28    engaged in this activity because they knew they faced little or no individual

- 38 -

risk as, if they were caught and sued, they would be protected by huge amounts of directors' and officers' liability insurance (purchased not with their funds, but rather with Blue Rhino's stockholders' monies and with Blue Rhino's own assets), which they could use to defend themselves and settle any securities suits.

66. While purchasers of Blue Rhino's securities during the Relevant Period have suffered significant losses, Blue Rhino's insiders did not fare nearly so badly. Two insiders, defendants Lunn and Warnock, as well as two entities controlled by Warnock, unloaded 169,734 shares of the Company's stock between August 20, 2002 and December 3, 2002 (with more than 150,000 of the shares being sold on December 2, 2002 and December 3, 2002), pocketing over $3.1 million in illegal insider trading proceeds, as shown below:

| NAME | DATE | SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|---|
| Lunn | 09/20/02 | 17,734 | $14.116 | $ 250,333.00 |
| | 12/03/02 | 2,000 | $18.00 | 36,000.00 |
| **Warnock** | 12/02/02 - 12/03/02 | 75,000 | $17.94 - 19.69 | 1,411,000.00 |
| **Warnock/ Camden Partners Str. Fund** | 12/02/02- 12/03/02 | 72,750 | $17.94 - 19.69 | $1,369,000.00 |
| **Warnock/ Cahill Warnock SPFLP** | 12/02/02- 12/03/02 | 2,250 | $17.94 | $40,369.00 |
| **TOTAL** | | 169,734 | | **$3,106,702.00** |

67. Defendants inflated the price of Blue Rhino shares by issuing false and materially misleading statements that allowed the defendants to (i) deceive the investing public regarding Blue Rhino's business, operations, management and the intrinsic value of Blue Rhino common stock;

- 39 -

1    (ii) enabled Defendants to acquire over \$30 million in assets, purchased ·

2    using artificially inflated Blue Rhino shares, to refinance debt upon more

3    favorable terms with its lenders; (iii) allowed Defendants to sell over 15

4    million worth of stock in a private placement and then register those shares

5    with a value over \$23.8 million for the two large shareholders that had

6    entered into the private equity deal so that the shares could be sold before

7    the truth regarding defendants' conduct was revealed; and (iv) allowed

8    certain insiders, along with entities controlled by certain insiders, to sell

9    over 160,000 shares of company stock and garner illegal proceeds of more

10   than 3.1 million. Specifically, within days of announcing the acquisition of

11   Platinum and Ark and the "record results" for the first quarter of FY03,

12   defendants Lunn and Warnock, along with two entities controlled by

13   Warnock, dumped over 150,000 shares of Company stock.

14   68.  The sale of over \$3.1 million of Company stock by insiders of Blue Rhino

15   was unusual in nature and timing, which is strong evidence that defendants

16   acted to capitalize on their material misrepresentations and failure to

17   disclose adverse non-public information.

18   69.  The insiders' stock sales were also *per se* evidence of defendants' science

19   because they all occurred during the time when the Company was failing to

20   perform as indicated in earlier statements defendants caused the Company

21   to make and defendants had artificially inflated Blue Rhino's financials, and

22   before the time when defendants issued the February 5, 2003 statements

23   which caused the stock price to plummet.

24   70.  Since the time that defendants made their revelations concerning the true

25   financial condition and growth prospects of the Company, a disclosure

26   which decimated the price of its stock, several shareholder class action

27   lawsuits have been filed against the Company alleging that Blue Rhino's

28   public disclosures were materially false and misleading and in violation of

- 40 -

1    federal securities laws. These class action lawsuits have been consolidated

2    in the federal court in the Central District of California and will continue to

3    expose the Company to enormous liability and costs.

4

5                    **Defendants' Violations of GAAP Rules**

6    71.    The financial results that defendants caused the Company to announce were

7    in violation of GAAP, and the following principles:

8        1.    The principle that "interim financial reporting should be based
9              upon the same accounting principles and practices used to
               prepare annual financial statements"
               was violated (APB No. 28, ¶ 10);
10
11       2.    The principle that "financial reporting should provide
               information that is useful to present to potential investors and
               creditors and other users in making rational investment, credit,
12             and similar decisions" was violated (FASB Statement of
               Concepts No. 1, ¶34);
13
14       3.    The principle that "financial reporting should provide
               information about the economic resources of an enterprise, the
               claims to those resources, and effects of transactions, events
15             and circumstances that change resources and claims to those
               resources" was violated (FASB Statement of Concepts
16             No. 1, ¶40);

17       4.    The principle that "financial reporting should provide
               information about an enterprise's financial performance during
18             a period" was violated (FASB Statement of Concepts No. 1,
               ¶42);
19
20       5.    The principle that " completeness, meaning that nothing is left
               out of the information that may be necessary to insure that it
               validly represents underlying events and conditions" was
21             violated (FASB Statement of Concepts No. 2, ¶79);

22       6.    The principle that "financial reporting should be reliable in that
               it represents what it purports to represent" was violated (FASB
23             Statement of Concepts No. 2, ¶¶58-59);

24       7.    The principle that "conservatism be used as a prudent reaction
               to
25             uncertainty to try to ensure that uncertainties and risks inherent
               in business situations are adequately considered" was violated
26             (FASB Statement of Concepts No. 2, ¶95); and

27       8.    The principle that "[f]inancial reporting should provide
               information about how management of an enterprise has
28             discharged its stewardship responsibility to owners

                                    - 41 -
                      SHAREHOLDER DERIVATIVE COMPLAINT

1   (stockholders) for the use of enterprise resources entrusted to
    it.... To the extent that management offers securities of the
2   enterprise to the public, it voluntarily accepts wider
    responsibilities for accountability to prospective investors and
3   to the public in general." (FASB Statement of Concepts No. 1,
    ¶50).

4   72.  The adverse information concealed by defendants and detailed above was in

5        violation of Item 303 of Regulation S-K under the federal securities law (17

6        C.F.R. 229.303).

7   73.  Moreover, the adverse information concealed by defendants and detailed

8        above was in violation of SEC Regulation S-X, which states that "financial

9        statements filed with the SEC which are not prepared in compliance with

10       GAAP are presumed to be misleading and inaccurate." SEC Regulation S-

11       X also required that "interim financial statements [i.e., Form 10-Qs] must

12       also comply with GAAP." 17 C.F. R. §210.10-01(a).

13

14             **Derivative and Futility of Demand Allegations**

15  74.  Plaintiff brings this action derivatively in the right of and for the benefit of

16       Blue Rhino to redress injuries suffered and to be suffered by Blue Rhino as

17       a direct result of the violations of law, breaches of fiduciary duty, corporate

18       mismanagement, abuse of control, as well as the aiding and abetting thereof,

19       by the Individual Defendants. Blue Rhino is named as a nominal defendant

20       solely in a derivative capacity. This is not a collusive action to confer

21       jurisdiction on this Court which it would not otherwise have.

22  75.  Plaintiff will adequately and fairly represent the interests of Blue Rhino and

23       its shareholders in enforcing and prosecuting their rights.

24  76.  It would be futile to require plaintiff to issue a demand to the Individual

25       Defendants requesting them to take action against themselves and certain

26       senior Blue Rhino executives for their intentional or reckless conduct as

27       alleged herein. Not only would this require them to investigate and bring

28

                            - 42 -

1         claims against themselves for their own misconduct, but their actions, to ·

2         date, prove conclusively that they will not take action.

3   77.   Plaintiff did not make a demand on the Board of Directors of Blue Rhino to

4         bring this action because such demand would be futile given the facts as

5         alleged herein and, therefore, such a demand is excused.

6   78.   The directors of Blue Rhino cannot be relied upon to reach a truly

7         independent decision as to whether to commence the demanded actions

8         against themselves and the officers, employees or consultants responsible

9         for the misconduct alleged in this complaint, in that, *inter alia*, the Board of

10        Directors is dominated by defendants who were personally and directly

11        involved in the misconduct alleged and/or who each approved the actions

12        complained of, and to whose directives and views the Board has

13        consistently acceded and will continue to accede. This domination of the

14        Board of Directors by certain defendants has impaired the Board's ability to

15        validly exercise its business judgment and rendered it incapable of reaching

16        an independent decision as to whether to accept plaintiff's demands.

17   79.   In order to bring this action for breaching their fiduciary duties and

18        engaging in other misconduct, the members of the Blue Rhino Board of

19        Directors would have been required to sue themselves and/or their fellow

20        directors and allies in the top ranks of the Corporation, who are their good

21        friends and with whom they have entangling financial alliances, interests

22        and dependencies, which they would not do. Therefore, the Individual

23        Defendants would not be able to vigorously prosecute any such action.

24   80.   The members of the Blue Rhino Board of Directors receive benefits, stock

25        options and other emoluments by virtue of their membership on the Board

26        and their control of Blue Rhino. They have thus benefitted from the

27        wrongdoing herein alleged and have engaged in such conduct to preserve

28        their positions of control and the perquisites thereof, and are incapable of

1    exercising independent objective judgment in deciding whether to bring this
2    action. The Board members also have close personal and business ties with
3    each other and are, consequently, interested parties and cannot in good faith
4    exercise independent business judgment to determine whether to bring this
5    action against themselves and one another.

6  81. The composition of Blue Rhino's Board of Directors is designed to (and
7    does) make them dependent on and deferential to defendants Prim and
8    Filipowski who, as a practical matter, control and dominate the process by
9    which directors are selected for nomination or renomination to the Board.
10   Non-employee directors are given stock options to purchase thousands of
11   shares of Blue Rhino stock, the amount of which the officers named as
12   defendants herein are in a position to influence or control. Thus, no non-
13   officer Board member can be independent as he or she has a direct
14   economic incentive to please the top officers and the Board Chairman to
15   stay on the Board.

16 82. Despite their knowledge of these facts, the Defendants intentionally allowed
17   the Company to disseminate false and misleading financial information to
18   the investing public without reasonably assuring themselves that the
19   Company would comply with required accounting procedures and otherwise
20   comply with its legal requirements.

21 83. The Defendants undertook this course of conduct with intentional and/or
22   reckless breach of their fiduciary duties because they were afraid that taking
23   the drastic action that was necessary to correct and address the severe lack
24   of any internal controls would: (a) harm the market price of Blue Rhino's
25   stock; (b) result in the loss of goodwill in the investing community; and (c)
26   jeopardize their personal reputations and financial interests.

27 84. Plaintiff has not made any demand on the Blue Rhino Board of Directors or
28   its shareholders to institute an action against the Defendants for their breach

- 44 -

of fiduciary duties and other misconduct since such demand would be a ·
futile and useless act for, *inter alia*, the following reasons:

1. A majority of the Blue Rhino Board of Directors participated in, approved or recklessly disregarded the wrongs complained of herein, which could not have been an exercise of good faith business judgment.

2. Blue Rhino's Board has engaged in a systematic course of conduct pursuant to which they have continually favored the interests of Blue Rhino insiders, particularly defendants Prim, Filipowski, Warnock and Lunn at the direct expense of the Company and its stockholders, which could not have been an exercise of good faith business judgment.

3. Defendants Prim and Filipowski are brothers-in-law that formed the Company in 1994. They, along with defendant Brenner, dominate the Board of Directors. The three are the sole members of the Executive Committee of the Board of Directors and are empowered to act for the Board. The three defendants are well known and well connected in the Winston-Salem business community. Defendant Prim and Brenner serve together on the Board of Directors of Southern Community Bank and Trust ("Southern Community") which has eight (8) branches in Winston-Salem, North Carolina. Indeed, Southern Community was the primary bank for Platinum and its obligations to Southern Community had been unconditionally guaranteed and secured by defendants Prim and Filipowski in the principal amount of up to $3,500,000, which amount was paid off when defendants caused Blue Rhino to "acquire" Platinum. Moreover, defendant Prim also serves on the Board of Directors of Brenner Children's Hospital & Health Services of the Wake Forest University Baptist Medical

- 45 -

1    Center. The Brenner Children's Hospital is named after the family of
2    defendant Richard A. Brenner, who is a close friend and Winston-
3    Salem business associate of defendant Prim. Further, defendant
4    Filipowski, along with defendant Prim each own a 50% stake in
5    Rhino Real Estate, LLC. Since 1994, Blue Rhino leases its offices in
6    Winston-Salem from Rhino Real Estate, LLC. The lease requires the
7    Company to pay defendants Prim and Filipowski's company
8    $333,264 per year plus additional expenses and taxes.

9    4.   Defendant Filipowski was the principal of Platinum Venture Partners,
10    LLP. Prior to the sale of Platinum Venture Partners to Computer
11    Associates, defendant Prim was a partner in Platinum Venture
12    Partners. Also, defendant Steven D. Devick was a principal of
13    Platinum Technology International, Inc., the software developer that
14    defendant Filipowski took public in 1991. Defendants Filipowski and
15    Devick were among the principals/directors at Platinum Technology
16    that started Platinum Venture partners.

17    5.   The principal professional occupation of defendant Castaneda is his
18    employment with Blue Rhino, and he owes his position and
19    livelihood to maintaining the good will of defendant Prim who is his
20    management superior. Castaneda has received and continues to
21    receive substantial monetary benefits due to his employment with
22    Blue Rhino, including, but not limited to, hundreds of thousands of
23    dollars in salary and cash bonuses, options to purchase shares of Blue
24    Rhino common stock, and other compensation and benefits.
25    Accordingly, Castaneda is incapable of considering a demand to
26    initiate and prosecute this action.

27    6.   Despite their knowledge of the wrongdoing alleged herein, the
28    directors of Blue Rhino have not taken action to seek recompense

- 46 -

1             from the wrongdoers who have caused harm to the Company,

2             including, but not limited to, defendants Prim, Filipowski, Lunn and

3             Warnock.

4    7.     The acts which are complained of herein constitute violations of

5             fiduciary duties  owed to the Company and its shareholders and

6             violations of law and these acts are incapable of ratification.

7    8.     The members of the  Audit Committee, defendants Brenner, Lunn,

8             Warnock and Muehlstein who comprise a majority of the purported

9             "independent" members of the Board, exhibited a sustained and

10            systematic failure to fulfill their fiduciary duties, which could not

11            have been an exercise of good faith business judgment. There is a

12            substantial likelihood that defendants Brenner, Lunn, Warnock and

13            Muehlstein will be held personally liable for their misconduct.

14    9.     Each of the Individual Defendants knew of and/or directly benefitted

15            from the wrongdoing complained of herein. Specifically, as a result

16            of their access to and review of internal corporate documents;

17            conversations and connections with other corporate officers,

18            employees, and directors; Defendants knew the adverse non-public

19            information regarding the averments set forth in paragraph 39 (a) -

20            (f), *supra.* While in possession of this material adverse non-public

21            information regarding the Company, defendant Lunn sold 19,734

22            shares of his Blue Rhino stock, realizing illicit gross proceeds of

23            almost \$300,00.00; and defendant Warnock and entities controlled by

24            defendant Warnock sold 150,000 shares of  Blue Rhino stock,

25            realizing illicit gross proceeds of over \$2.85 million dollars.

26            Accordingly, these selling defendants are directly interested in the

27            subject transactions and therefore are incapable of considering a

28            demand to initiate and prosecute this action.

10. In order to bring this suit, the Individual Defendants would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do. These inter-related business and personal relationships have developed debilitating conflicts of interest which prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.

11. A majority of Blue Rhino's Board own substantial amounts of the Company stock and have personally profited from these wrongful acts.

12. To bring an action against themselves would subject the Defendants to personal liability in the securities class action lawsuits pending, as well as additional liability in future lawsuits that could result from such an action.

13. Blue Rhino's officers and directors are protected against personal liability by a directors' and officers' liability insurance policy. They caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders of Blue Rhino. However, the directors' and officers' liability insurance policies covering defendants contain provisions which eliminate coverage for any action brought directly by Blue Rhino against these defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if these directors were to sue themselves, no insurance protection would be provided for the derivative claims. Thus, this is a further reason why the Blue Rhino Board will not bring such a suit, for to do so would subject themselves and their colleagues and/or friends to a judgment of millions of dollars that would have to be paid from their individual assets alone. On the other hand, if the

- 48 -

1      claims are brought derivatively, such insurance coverage will provide

2      a basis for the Company to effectuate a recovery.

3

4               **Reasonable Doubt Exists That the Blue Rhino Board Is**

5               **Entitled to the Business Judgment Protection**

6 85. For the reasons set forth herein, a reasonable doubt exists that the Board's

7      approval and/or acquiescence to the Company's improper accounting

8      methods and absence of appropriate business controls was the product of a

9      valid exercise of business judgment.

10 86. As directors of the Company, the Director Defendants received, or should

11      have received, regular and detailed financial reports and were, or should

12      have been, kept abreast and made familiar with the current financial

13      conditions of the Company.

14 87. The directors of the Company served on committees for which they were

15      compensated by way of significant grants of stock options pursuant to

16      which they were specifically vested with duties to closely monitor the

17      business and financial performance of the Company. These committees

18      included the Audit Committee, the Compensation Committee, and

19      Executive Committee

20 88. As part of their fiduciary duties, the Director Defendants had an obligation

21      to inform themselves, prior to making a business decision, of all material

22      information reasonably available to them. Certainly, the preceding

23      averments establish that the Blue Rhino Board had and has sufficient

24      information to take action regarding the false and misleading statements

25      being made to the market and the investment community.

26 89. Had the Board discharged its duty of reasonable inquiry, it would have been

27      alerted to the facts set forth in ¶ 41(a)-(f).

28

1  90.  The Blue Rhino Board of Directors' failure to discharge its duty of inquiry
2  was a gross and reckless disregard of its fiduciary duties to Blue Rhino and
3  its shareholders, and caused the Company harm.

4  91.  Accordingly, the Defendants, together constituting a majority of the
5  directors on the Board, as of the filing of this complaint, face a substantial
6  likelihood of liability if an action asserting the claims alleged herein is
7  brought against them, thus disabling the Individual Defendants from being
8  capable of making a disinterested, independent decision about whether to
9  prosecute this action. Therefore, demand on the Board would have been
10  futile.

11  92.  Under all of the circumstances, the Defendants' actions were outrageous
12  and were taken intentionally or, at a minimum, with reckless disregard for
13  the legal rights of Blue Rhino and the legal obligations and duties of the
14  Defendants.

15  **FIRST CAUSE OF ACTION**

16  **Breach of Fiduciary Duties For Failure to Establish**

17  **and Maintain Adequate Accounting Controls**

18  93.  Plaintiff incorporates by reference each of the foregoing allegations.

19  94.  As alleged in detail herein, each of the Defendants had a duty to Blue Rhino
20  and its shareholders to establish and maintain adequate internal accounting
21  controls to ensure that the Company's financial results were recorded in
22  compliance with GAAP.

23  95.  The Individual Defendants did not establish and maintain adequate internal
24  accounting controls at Blue Rhino and did not make a good faith effort to do
25  so; thus, they abdicated their fiduciary duty of good faith.

26  96.  As a direct and proximate result of the Individual Defendants' foregoing
27  breaches of fiduciary duties, the Company has suffered enormous damages,
28  as alleged herein.

1

## SECOND CAUSE OF ACTION

2

### Unjust Enrichment

3

97. Plaintiff incorporates by reference each of the foregoing allegations.

4

98. As a result of the foregoing conduct, including the huge profits earned in

5

illegal insider trading and the compensation received by the Defendants,

6

defendants have been unjustly enriched at the expense of Blue Rhino and/or

7

have aided and abetted the unjust enrichment of the other Individual

8

Defendants.

9

99. Blue Rhino and its shareholders have been injured by reason of this unjust

10

enrichment. Plaintiff, as a shareholder and representative of Blue Rhino,

11

seeks damages and other relief for the Company as hereinafter set forth.

12

## THIRD CAUSE OF ACTION

13

### Against the Insider Selling Defendants for Violation of California Corporations Code §§25402 and 25502.5

14

15 100. Plaintiff incorporates by reference each of the foregoing allegations.

16 101. At the time that defendants sold their Blue Rhino common stock as set forth

17 herein, by reason of their positions with Blue Rhino, the defendants had

18 access to highly material information regarding the Company, including the

19 information set forth herein regarding the true adverse facts of Blue Rhino's

20 business and financial condition.

21 102. At the time of such sales, that information was not generally available to the

22 public or the securities markets. Had such information been generally

23 available, it would have significantly reduced the market price of Blue

24 Rhino shares at that time.

25 103. The defendants, and each of them, had actual knowledge of material,

26 adverse non-public information and thus sold their Blue Rhino common

27 stock in violation of California Corporations Code §25402.

28

- 51 -

1   104.  Blue Rhino has total assets in excess of $1,000,000 and a class of equity

2           securities held of record by 500 or more persons.

3   105.  Pursuant to California Corporations Code §25502.5, the Defendants, and

4           each of them, are liable to Blue Rhino for damages in an amount up to three

5           times the difference between the price at which Blue Rhino common stock

6           was sold by the Defendants, and each of them, and the market value which

7           that Blue Rhino common stock would have had at the time of the sale if the

8           information known to the defendants, and each of them, had been publicly

9           disseminated prior to that time and a reasonable time had elapsed for the

10          market to absorb the information.

11   106.  Further, pursuant to California Corporations Code §25502.5, the

12           Defendants, and each of them, are liable to the derivative Plaintiff herein for

13          reasonable costs and attorneys' fees in the prosecution of this derivative

14          action on behalf of Blue Rhino.

15   107.  Plaintiff, as a shareholder and representative of Blue Rhino, seeks damages

16          and other relief for the Company as hereinafter set forth.

17                             **PRAYER FOR RELIEF**

18      WHEREFORE, plaintiff demands judgment on behalf of Blue Rhino as

19 follows:

20     1.  Determining that this action is a proper derivative action maintainable

21 under California law;

22     2.  Awarding damages and/or restitution in favor of plaintiff, on behalf

23 of Blue Rhino, and against defendants and awarding punitive and exemplary

24 damages as appropriate, plus pre-judgment interest;

25     3.  Granting equitable and/or injunctive relief as permitted by applicable

26 law and equity, including attaching, impounding, imposing a constructive trust on

27 or otherwise restricting the proceeds of defendants' trading activities or their other

28

1  assets so as to assure that plaintiff on behalf of Blue Rhino has an effective

2  remedy;

3      4.    Awarding plaintiff reasonable attorneys' fees and costs, as well as all

4  other recoverable litigation expenses; and

5      5.    Granting such other and further relief as this Court may deem just and

6  proper.

7                          **JURY DEMAND**

8      Plaintiff demands a trial by jury.

9  DATED: December 22, 2003

10                          BRIAN BARRY (SBN 135631)
                            **LAW OFFICE OF BRIAN BARRY**
11                          1801 Ave. of the Stars, Suite 307
                            Los Angeles, California 90067
12                          Telephone: (310) 788-0831
                            Facsimile: (310) 788-0841
13
                            **BRODSKY & SMITH, LLC**
14                          MARC L. ACKERMAN
                            EVAN J. SMITH
15                          JASON L. BRODSKY
                            Two Bala Plaza, Suite 602
16                          Bala Cynwyd, PA 19004
                            Telephone: (610) 667-6200
17                          Facsimile  (610) 667-9029

18                          Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28

                          - 53 -

<div align="center"><u>PROOF OF SERVICE</u></div>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, the undersigned, declare: that I am employed in the aforesaid County, State of California in the office of a member of the Bar of this Court at whose direction the following service was made. I am over the age of 18 and not a party to the within entitled action; my business address is: 1801 Avenue of the Stars, Suite 307, Los Angeles, California 90067.

On December 22, 2003, I served upon the interested parties in this action, pursuant to Fed. R. Civ. P. Rule 5(b) and Local Rule 5-3, the document described as follows:

AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT AND VIOLATIONS OF CALIF. CORPS. CODE SECTIONS 25402 & 25502.2

[X]   by sending a true and correct copy thereof VIA U.S. Mail to:

**BRODSKY & SMITH, LLC**
MARC L. ACKERMAN
EVAN J. SMITH
JASON L. BRODSKY
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004

**McDERMOTT, WILL & EMERY**
Eric Landau
Steven J. Aaronoff.
18191 Von Karman Avenue, Suite 400
Irvine, CA 92612

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct. Executed on Dec. 22, 2003, at Los Angeles, Los Angeles County, California.

Jill Betts