

1  BRIAN BARRY (SBN 135631)
   **LAW OFFICE OF BRIAN BARRY**
2  1801 Ave. of the Stars, Suite 307
   Los Angeles, California 90067
3  Telephone:    (310) 788-0831
   Facsimile:    (310) 788-0841
4
   **BRODSKY & SMITH, LLC**
5  MARC L. ACKERMAN
   EVAN J. SMITH
6  JASON L. BRODSKY
   Two Bala Plaza, Suite 602
7  Bala Cynwyd, PA 19004
   Telephone:    (610) 667-6200
8  Facsimile     (610) 667-9029
   **Attorneys for Plaintiff**
9
              UNITED STATES DISTRICT COURT
10
           CENTRAL DISTRICT OF CALIFORNIA
11
                   WESTERN DIVISION
12
   RANDY GISH, Derivatively on Behalf of       )  Case No. CV 03-4680NM(AJWx)
13 BLUE RHINO, INC.,                           )
                                               )  SECOND AMENDED VERIFIED
14                          Plaintiff,          )  SHAREHOLDER DERIVATIVE
               vs.                             )  COMPLAINT FOR BREACH OF
15                                             )  FIDUCIARY DUTY AND UNJUST
   BILLY D. PRIM, ANDREW J. FILIPOWSKI,        )  ENRICHMENT AND VIOLATIONS OF
16 MARK CASTANEDA, STEVEN D. DEVICK,           )  CALIF. CORPS. CODE SECTIONS 25402
   RICHARD A. BRENNER, ROBERT LUNN,            )  & 25502.2
17 DAVID WARNOCK , JOHN H.                     )
   MUEHLSTEIN                                  )
18 AND TIMOTHY SCRONCE,                        )
                                               )
19                          Defendants,         )
                                               )
20         - and -                             )      **ORIGINAL**
                                               )
21 BLUE RHINO, INC., a Delaware corporation,   )
                                               )
22               Nominal Defendant.            )
   _____   )
23                                                  DEMAND FOR JURY TRIAL
24
25         Plaintiff alleges, upon personal knowledge as to himself and his own acts, and as to all other

26 matters upon information and belief, based upon, *inter alia*, the investigation made by and through

27 his attorneys, which includes a review of the public filings of Blue Rhino, Inc. ("Blue Rhino," the

28

DOCKETED ON V.G

APR 2 1 2004

BY

_____
SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT        013

1    "Corporation" or the "Company") including, without limitation, Forms 10-K and 10-Q, annual

2    reports, proxy statements, press releases, published reports and news articles, as follows:

3                              **INTRODUCTION AND OVERVIEW**

4         1.       This is a verified stockholder's derivative action brought on behalf of Blue Rhino by

5    one of its shareholders against its entire Board of Directors and/or several of the Corporation's top

6    officers for: (i) breach of fiduciary duty in misappropriating and misusing internal proprietary non-

7    public material corporate information to personally profit by illegal insider trading in the Company's

8    stock; (ii) failing to properly oversee or implement federal or state laws prohibiting such illegal

9    insider trading as well as Blue Rhino's own policies and rules restricting the misuse of internal

10   corporate information for such purposes; (iii) causing Blue Rhino to be sued for, and exposed to,

11   liability for violations of the anti-fraud provisions of the federal securities laws; and (iv) for the

12   illegal insider trading in the Corporation's stock in violation of California Corporations Code

13   §§25402 and 25502.5.

14        2.       Defendants are liable as participants in a fraudulent course of business by

15   disseminating materially false and misleading statements and/or concealing material adverse facts

16   regarding the Company, including: (1) that certain distributors acquired by the Company on

17   November 22, 2002 were not healthy, highly profitable, and independent of the Company, as

18   portrayed by the Defendants. In fact, the distributors acquired by Blue Rhino had lost $2.8 million

19   in the first ten (10) months of 2002 alone and owed Blue Rhino $5 million in cash advances in

20   addition to the $2.8 million in debt. Also, one of the acquired distributors was in violation of its

21   debt covenants for 2001; (2) that Defendants misrepresented that the purchase price of the acquired

22   distributors only totaled $21 million when in fact the true price of the acquisition was $32 million;

23   (3) that the Company was beginning to see a decline in earnings from Overfill Protection Device

24   ("OPD") regulations; (4) that the Company's earnings projections were lacking in any reasonable

25   basis when made; and (5) that the false and misleading information disseminated by Defendants

26   caused the Company stock to trade at artificially inflated prices.

27        3.       In disseminating the false and misleading information set forth in the preceding

28   paragraph, Defendants: (i) deceived the investing public regarding Blue Rhino's business,

1   operations, management and the intrinsic value of Blue Rhino common stock; (ii) enabled

2   Defendants to acquire over $30 million in assets, purchased using artificially inflated Blue Rhino

3   shares in order to refinance debt upon more favorable terms with its lenders; (iii) allowed

4   Defendants to sell over 15 million worth of stock in a private placement and then register those

5   shares with a value over $23.8 million for two large shareholders that had entered into the private

6   equity deal so that the shares could be sold before the truth regarding defendants' conduct was

7   revealed; and (iv) allowed certain insiders, along with entities controlled by certain insiders, to sell

8   over 160,000 shares of company stock and garner illegal proceeds of more than $3.1 million.

9

10        4.     As a result of defendants' illegal conduct, Blue Rhino has been significantly and

11 materially damaged. First, in violation of California common law and statute, certain corporate

insiders have misappropriated and misused material non-public proprietary information regarding

12 defendants' inability to manage and control the financial and manufacturing capabilities of the

13 Company, for their own personal profit, selling more than 160,000 shares of their privately held

14 Blue Rhino stock and garnering for themselves illicit proceeds of over $3.1 million. In addition,

15 the false statements made by defendants, which artificially inflated the price of the Company's

16 common stock and thus permitted the corporate insiders to profit from their insider trading

17 activities, have resulted in the Company being named a defendant in several securities fraud class

18 action lawsuits. These class action lawsuits, now consolidated in federal district court in

19 California, seek significant damages and will cost the Company millions of dollars to defend and

20 likely millions of dollars more to settle or satisfy.

21

22        5.     The illegal insider trading activities of certain of the defendants will make the

securities class action suits much more difficult, if not impossible, to defend and will provide a

23 basis for Blue Rhino's directors' and officers' liability insurance carrier to disclaim coverage under

24 the active and deliberate dishonesty exclusion or the insider trading exclusion and/or negotiate a

25 defense expense sharing allocation with Blue Rhino that will be unfavorable to the Company.

26 Moreover, these revelations of certain defendants' illegal insider trading and violations of the

27 securities laws have badly damaged Blue Rhino's corporate image and good will. For at least the

28

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     foreseeable future, Blue Rhino will suffer from what is known as the "liar's discount," a term
2     applied to the stocks of companies who have been implicated in illegal behavior and have misled
3     securities analysts and the investing public, such that Blue Rhino's ability to raise equity capital on
4     favorable terms in the future will be impaired.

5         6.      Management of Blue Rhino is antagonistic to this lawsuit and making demand on
6     the Board of Directors would be futile. The Board as a whole has extremely close alliances with
7     and allegiances to the insiders who engaged in the illegal insider selling complained of herein and
8     among each other and will not bring any action directly against them on behalf of the Company.
9     Moreover, in order to properly prosecute this lawsuit, it would be necessary for the Directors to sue
10    themselves – something they are unwilling to do. Such a suit would require the Directors to expose
11    themselves to multi-million dollar liability to the Company, which, due to the particular language
12    of currently utilized directors' and officers' liability insurance policies (*i.e.*, the insured vs. insured
13    exclusion), would not be an insured claim, while the claims asserted via this derivative action would
14    be insured.

15        7.      Since the insider trading activities of the insider selling defendants are illegal under
16    specific California corporate law and are not covered by Blue Rhino's directors' and officers'
17    liability insurance, in order to adequately protect Blue Rhino's interests in this situation, it is
18    necessary for the Company to seek and obtain preliminary injunctive relief against the individual
19    defendants who sold Blue Rhino stock based on misappropriated proprietary corporate information,
20    imposing a constructive trust on and/or freezing those insider selling proceeds so that they will be
21    available to Blue Rhino if this suit is successful on the merits. Absent such a freeze, these
22    defendants who sold Blue Rhino stock based on inside information will dissipate and/or secrete
23    their insider sales proceeds, making it much more difficult to recover those proceeds. Under these
24    circumstances, making a pre-suit demand also would unreasonably delay the pursuit of important
25    legal remedies.

26                         **JURISDICTION AND VENUE**

27        8.      This Court has jurisdiction over the subject matter of this action pursuant to the
28    removal of this action from state court by defendants.

- 3 -

1    9.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b). Blue Rhino
2         conducts

3  substantial business in this District and many of the acts and practices complained of herein
4  occurred in substantial part in this District. In addition, each of the Company's wholly-owned
5  subsidiaries, Ark and Platinum of Los Angeles, conduct significant business in and maintain offices
6  in this District. Moreover, in connection with Blue Rhino's acquisition of Platinum and its
7  distributors, many of the acts complained of herein occurred in this District, including but not
8  limited to the following:

9         (a) Platinum Propane LLC ("Platinum") and its distributors conduct significant business in
10  California and have an office located at 2880 Norton Avenue, Lynwood, CA;

11        (b) Defendants, through Blur Rhino, a national corporation, conducts significant business
12  in California and maintains offices, through the Ark Holding Co., LLC ("Ark") acquisition at 818
13  West 7th Street, Los Angeles, CA;

14        (c) With respect to the acquisition of Platinum, Defendants caused Blue Rhino to conduct
15  significant activities in this County, including the following:

16             (1) significant asset valuation of Platinum by Blue Rhino;

17             (2) negotiations conducted by or on behalf of Defendants regarding the acquisition
18             of Platinum; and

19             (3) review of both Blue Rhino's and Platinum's business records.

20        (d) With respect to the acquisition of Ark, Defendants caused Blue Rhino to conduct
21  significant activities within this County, including the following:

22             (1) significant asset valuation of Ark by Blue Rhino;

23             (2) negotiations conducted by or on behalf of Defendants regarding the acquisition
24             of Ark; and

25             (3) review of both Blue Rhino's and Ark's business records.

26  Additionally, the defendants named in this shareholders' derivative action have received substantial
27  compensation from their business activities within this judicial district.

28                              **THE PARTIES**

- 4 -

1    10.    Plaintiff Randy Gish is a resident of the State of Missouri who is an owner of shares
2  of Blue Rhino stock. Plaintiff purchased shares of blue Rhino stock on November 4, 2002 and has
3  owned Blue Rhino stock continuously through to the present. Plaintiff brings this action
4  derivatively in the right of and for the benefit of Blue Rhino. Plaintiff will fairly and adequately
5  represent the interests of Blue Rhino and the shareholders of Blue Rhino in enforcing the rights of
6  the Company.

7    11.    Nominal Defendant Blue Rhino is a Delaware corporation with its headquarters
8  located at 104 Cambridge Plaza Drive, Winston-Salem, North Carolina 27104. Blue Rhino is a
9  national provider of propane gas and propane gas accessories, including cylinder exchanges and
10 related propane products. The Company's retail partners include Home Depot, Lowe's, Wal-Mart,
11 Sears, KMart, Kroger, Food Lion, Win Dixie, Circle K and ExxonMobil. Ark Holdings, one of the
12 Company's wholly owned subsidiaries and a major distributor for Blue Rhino, maintains offices in
13 Los Angeles at 818 West 7th Street. Platinum Propane of Los Angeles also maintains offices in this
14 District at 2880 Norton Avenue, Lynwood, California.

15   12.    Defendant Billy D. Prim ("Prim") is, and at all times relevant to the allegations raised
16 herein, was Chief Executive Officer ("CEO") and Chairman of Blue Rhino. He served as President
17 of the Company from 1996 to November 2002. Defendant Prim co-founded the Company in 1994.
18  According to the Company's FY:02 Proxy Statement, as of November 8, 2002, defendant Prim
19 owned or controlled over 1,570,350 shares of Blue Rhino stock, approximately 10.6% of all
20 outstanding common shares of the Company. In exchange for his purported loyalty and fidelity,
21 defendant Prim, as one of the two individuals that served as an officer and employee-director of the
22 Company (along with defendant Mark Castaneda), received the following very significant
23 compensation package from Blue Rhino during FY:02: salary – $387,996; bonus – $99,804; other
24 compensation - $132, 590, as well as the option to purchase 173,000 shares of Blue Rhino stock.
25 In addition to his dominance and control over Blue Rhino as a result of his stock ownership and
26 position as Chairman, CEO and/or President of the Company, defendant Prim also has longstanding
27 personal and professional entanglements and relationships with other Board members, which have
28

- 5 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   prevented them and is preventing him from acting independently to fulfill the fiduciary duties owed

2   to Blue Rhino and its shareholders, including:

3           i.      Defendant Prim and defendant Andrew J. Filipowski are brothers-in-law

4                   who

5   co-founded the Company in 1994.

6

7           ii.     Defendant Prim was also a director of Ark and Platinum.

8           iii.    Defendant Prim is a member of the Executive Committee (along with

9                   defendants

10  Andrew J. Filipowski and defendant Richard A. Brenner).  The Executive Committee makes

11  recommendations to the Board of Directors concerning matters of strategic planning and operational

12  management and has the power to address matters on behalf of the Board.

13          iv.     Defendant Prim and defendant Richard A. Brenner serve together on the

14                  Board

15  of Directors of Southern Community Bank and Trust which has eight (8) branches in Winston-

16  Salem, North Carolina.

17

18          v.      Defendant Prim also serves on the Board of Directors of Brenner Children's

19  Hospital & Health Services of the Wake Forest University Baptist Medical Center.  The Brenner

20  Children's Hospital is named after the family of defendant Richard A. Brenner, who is a close

21  friend and Winston-Salem business associate of defendant Prim.

22          vi.     Defendant Prim, along with defendant Andrew J. Filipowski each own a

23                  50%

24  stake in Rhino Real Estate, LLC.  Since 1994, Blue Rhino leases its offices in Winston-Salem from

25  Rhino Real Estate, LLC.  The lease requires the Company to pay $333,264 per year plus additional

26  expenses and taxes.

27          vii.    In the 1990s, Defendant Prim, along with defendant Andrew J. Filipowski,

28

- 6 -
SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 founded two companies, Platinum and Ark. Allegedly, at some later date defendants Prim and
2 Filipowski divested their interest in Platinum and Ark. In contrast, however, the Company's FY:02
3 Proxy Statement, states that the entity that then owned Platinum and Ark had obligations to its
4 primary bank that were unconditionally guaranteed and secured by defendants Prim and Filipowski
5 in the principal amount of up to $3,500,000. Regardless, in November 2002, Defendants caused the
6 Company to acquire Ark and Platinum, each of which owned several distributors, such that
7 Defendants Prim and Filipowski caused the Company to acquire a total of ten (10) propane
8 distributors.

9      13.     Defendant Andrew J. Filipowski ("Filipowski"), is, and at relevant times relevant
10 to the allegations raised herein, was a director of Blue Rhino and Vice Chairman of the Company.
11 He co-founded the Company in 1994 with defendant Prim. According to the Company's FY:02
12 Proxy Statement, as of November 8, 2002, defendant Filipowski owned or controlled over
13 2,067,070 shares of Blue Rhino stock, approximately 14% of all outstanding common stock. Also,
14 as a non-employee director of the Company, defendant Filipowski receives an option to purchase
15 12,000 shares of common stock of the Company on the first business day after each annual meeting
16 and an additional option for 1,000 shares based on his position as the Executive Committee. In
17 addition to his dominance and control over Blue Rhino as a result of his position as a co-founder
18 of the Company and the fact he alone controls 14% of the common shares of stock of the Company,
19 defendant Filipowski also has longstanding personal and professional entanglements and
20 relationships with other Board members, which have prevented them and is preventing him from
21 acting independently to fulfill the fiduciary duties owed to Blue Rhino and its shareholders,
22 including:

23           i.    Defendant Filipowski and defendant Prim are brothers-in-law who co-founded
24 the Company in 1994.
25
26           ii.   Defendant Filipowski was the principal of Platinum Venture Partners, LLP.
27 Prior to the sale of Platinum Venture Partners to Computer Associates, defendant Prim was a
28 partner in Platinum Venture Partners. Also, defendant Steven D. Devick was a principal of

- 7 -

1  Platinum Technology International, Inc., the software developer that defendant Filipowski took

2  public in 1991. Defendants Filipowski and Devick were among the principals/directors at Platinum

3  Technology that started Platinum Venture Partners and defendant Devick was the Chairman of the

4  Board and Chief Executive Officer of Platinum Entertainment, Inc., another related "Platinum"

5  venture and one that ended in bankruptcy in July 2000.

6          iii.   Defendant Filipowski a member of the Executive Committee (along with

7  defendants Prim and Richard A. Brenner). The Executive Committee makes recommendations to

8  the Board of Directors concerning matters of strategic planning and operational management and

9  has the power to address matters on behalf of the Board.

10         iv.   Defendant Filipowski, along with defendant Prim each own a 50% stake in

11  Rhino Real Estate, LLC. Since 1994, Blue Rhino leases its offices in Winston-Salem from Rhino

12  Real Estate, LLC. The lease requires the Company to pay $333,264 per year plus additional

13  expenses and taxes.

14

15         v.    In the 1990s, Defendant Prim, along with defendant Andrew J. Filipowski,

16  founded two companies, Platinum and Ark. Allegedly, at some later date defendants Prim and

17  Filipowski divested their interest in Platinum and Ark. In contrast, however, the Company's FY:02

18  Proxy Statement, states that the entity that then owned Platinum and Ark had obligations to its

19  primary bank that were unconditionally guaranteed and secured by defendants Prim and Filipowski

20  in the principal amount of up to $3,500,000. Regardless, in November 2002, Defendants caused the

21  Company to acquire Ark and Platinum, each of which owned several distributors, such that

22  Defendants Prim and Filipowski caused the Company to acquire a total of ten (10) propane

23  distributors. Defendant Filipowski was also a director of Ark and Platinum.

24         vi.   Defendant Filipowski is the Chairman and CEO of Divine, Inc., an extended

25  enterprise solution company. Divine, Inc. is currently in bankruptcy. Defendant Filipowski is

26  presently a defendant in a federal securities class action involving his actions at Divine, Inc.

27  Additionally, the New York Attorney General's office is investigating activity at Divine, Inc. which

28  occurred during the Relevant Period of the conduct alleged herein.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

14.    Defendant Mark Castaneda ("Castaneda") is, and at all times relevant to the allegations raised herein, was a director of Blue Rhino and Chief Financial Officer of the Company. According to the Company's FY:02 Proxy Statement, as of November 8, 2002, Castaneda owned or controlled over 156,700 shares of Blue Rhino stock, approximately 1% of the outstanding common shares of the Company. In exchange for his purported loyalty and fidelity, defendant Castaneda, as one of the two individuals that served as an officer and employee-director of the Company (along with defendant Prim) received the following very significant compensation package from Blue Rhino during FY:02: salary – $192,308; bonus – $99,804; other compensation - $5,571, as well as the option to purchase 110,000 shares of Blue Rhino stock.

15.    Defendant Steven D. Devick ("Devick") is, and at all times relevant to the allegations raised herein was, a director of the Company and has served in this position since the Company's founding in 1994. According to the Company's FY:02 Proxy Statement, as of November 8, 2002, defendant Devick owned or controlled 31,193 shares of Blue Rhino stock. Also, as a non-employee director of the Company, defendant Devick receives an option to purchase 12,000 shares of common stock of the Company the first business day after each annual meeting and an additional option for 1,000 shares based on his participation on the Compensation Committee. In addition to his dominance and control over Blue Rhino as a result of his long-standing Board membership, defendant Devick also had longstanding personal and professional entanglements and relationships with other Board members which have prevented them and is preventing him from acting independently to fulfill the fiduciary duties owed to Blue Rhino and its shareholders, including:

i.    Defendant Devick and defendant Filipowski are long-standing friends and business partners. Defendant Devick was a principal in Platinum Technology, the software developer founded by defendant Filipowski that went public in 1991 and was eventually sold to Computer Associates for more than 3.5 billion dollars. Devick was also a principal along with defendant Filipowski of Platinum Venture Partners, the venture capital arm of Platinum Technology Defendant Prim was also a partner in this venture. Defendant Devick was also a co-founder of a related company, Platinum Entertainment, Inc. He resigned as Chairman of the Board and Chief

- 9 -

1  Executive Officer in June 2000. Platinum Entertainment, Inc. filed for bankruptcy protection one
2  month later;

3       ii.  Defendant Devick is a member of the Company's Compensation Committee,
4  along with defendant Richard A. Brenner. They were charged with, among other things,
5  establishing the salary and incentive compensation for the Company's Chief Executive Officer
6  (defendant Prim). The Compensation Committee also administers the Company's stock option
7  plans, including the review and grant of stock options to officers and other employees under the
8  Company's stock option plans. The Compensation Committee also reviews and approves various
9  other compensation policies and matters, and reviews and approves salaries and other matters
10 relating to compensation of the executive officers of the Company.

11      16.  Defendant Richard A. Brenner ("Brenner") is, and at all times relevant to the
12 allegations raised herein was, a director, and has been since 1998. According to the Company's
13 FY:02 Proxy Statement, as of November 8, 2002, defendant Brenner owned or controlled 45,636
14 shares of Blue Rhino. Also, as a non-employee director of the Company, defendant Brenner
15 receives an option to purchase 12,000 shares of common stock of the Company the first business
16 day after each annual meeting and an additional option for 3,000 shares based on his participation
17 on all three (3) of the Company's board committees. In addition to his dominance and control over
18 Blue Rhino as a result of being a director, defendant Brenner also has longstanding personal and
19 professional entanglements and relationships with other Board members which have prevented them
20 and is preventing her from acting independently to fulfill the fiduciary duties owed to Blue Rhino
21 and its shareholders, including the fact that:

22

23      i.  Defendant Brenner and defendant Prim are long-standing members of the
24 Winston-Salem business community. Defendants Brenner and Prim both serve on the board of
25 Southern Community Bank & Trust. In addition, defendant Prim serves on the Board of Directors
26 of Brenner Children's Hospital & Health Services of the Wake Forest University Baptist Medical
27 Center. The Brenner Children's Hospital is named after the family of defendant Richard A.
28 Brenner;

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     ii. Defendant Brenner is Chairman of the Company's Audit Committee, along with
2  defendants Robert Lunn, David Warnock and John H. Muehlstein. They were charged with, among
3  other things, ensuring that the Company had proper accounting procedures and controls in place so
4  as to guarantee that the Company was properly accounting for its assets and ensuring that the
5  Company's financial statements presented an accurate representation of the Company's financial
6  position at all times during the Relevant Period, which they did not;

7     iii. Defendant Brenner was also a member of the Compensation Committee, along
8  with defendant Devick. They were charged with, among other things, establishing the salary and
9  incentive compensation for the Company's Chief Executive Officer (defendant Prim). The
10 Compensation Committee also administers the Company's stock option plans, including the review
11 and grant of stock options to officers and other employees under the Company's stock option plans.
12 The Compensation Committee also reviews and approves various other compensation policies and
13 matters, and reviews and approves salaries and other matters relating to compensation of the
14 executive officers of the

15 Company.

16
17    iv.     Defendant Brenner is a member of the Executive Committee (along with
18 defendants

19 Prim and Filipowski). The Executive Committee makes recommendations to the Board of Directors
20 concerning matters of strategic planning and operational management and has the power to address
21 matters on behalf of the Board.

22    17.    Defendant Robert Lunn ("Lunn") is, and at all times relevant to the allegations raised
23 herein was, a director of the Company, and has served in this capacity since 1999. According to
24 the Company's FY:02 Proxy Statement, as of November 8, 2002, defendant Lunn owned or
25 controlled 42,531 shares of Blue Rhino stock. Also, as a non-employee director of the Company,
26 defendant Brenner receives an option to purchase 12,000 shares of common stock of the Company
27 the first business day after each annual meeting and an additional option for 1,000 shares based on
28

- 11 -

his participation on the Audit Committee. In addition to his dominance and control over Blue Rhino as a result of his Board membership, defendant Lunn also has longstanding personal and professional entanglements and relationships with other Board members which have prevented them and is preventing him from acting independently to fulfill the fiduciary duties owed to Blue Rhino and its shareholders, including:

      i.  Defendant Lunn is a member of the Company's Audit Committee, along with defendants Brenner, David Warnock and John H. Muehlstein. They were charged with, among other things, ensuring that the Company had proper accounting procedures and controls in place so as to guarantee that the Company was properly accounting for its assets and ensuring that the Company's financial statements presented an accurate representation of the Company's financial position at all times during the Relevant Period, which they did not;

      ii.  Defendant Lunn is the principal of Lunn Partners, an investment advisory firm that purchases shares of Blue Rhino stock for its clients;

18.  Defendant David Warnock ("Warnock") was at all times relevant to the allegations raised herein, a director of the Company (since 2000). According to the Company's FY:02 Proxy Statement, as of November 8, 2002, defendant Warnock owned or controlled 6,667 shares of Blue Rhino stock. Also, as a non-employee director of the Company, defendant Warnock receives an option to purchase 12,000 shares of common stock of the Company the first business day after each annual meeting and an additional option for 1,000 shares based on his participation on the Audit Committee. In addition to his dominance and control over Blue Rhino as a result of his stock ownership and position as a director of the Company, defendant Warnock also has longstanding personal and professional entanglements and relationships with other Board members, which have

- 12 -

1  prevented them and is preventing him from acting independently to fulfill the fiduciary duties owed

2  to Blue Rhino and its shareholders, including:

4       i.    Defendant Warnock is the General Partner of Camden Partners Strategic II, LLC

5  (formerly known as Cahill, Warnock Strategic Partners II, LLC). Camden Partners owns or controls

6  over 1,611,140 shares of common stock of the Company, approximately 11% of all outstanding

7  common shares of the Company and, as such, has the right to designate a board member, in this

8  case defendant Warnock;

10      ii.   Defendant Warnock is a member of the Company's Audit Committee, along

11  with defendants Brenner, Lunn and John H. Muehlstein. They were charged with, among other

12  things, ensuring that the Company had proper accounting procedures and controls in place so as to

13  guarantee that the Company was properly accounting for its assets and ensuring that the Company's

14

15  financial statements presented an accurate representation of the Company's financial position at all

16  times during the Relevant Period, which they did not.

17      19.   Defendant John H. Muehlstein ("Muehlstein") is, and was at times relevant to the

18  allegations raised a longstanding director of the Company (since 1995). According to the

19

20  Company's FY:02 Proxy Statement, as of November 8, 2002, defendant Muehlstein owned or

21  controlled 26,448 shares of Blue Rhino stock. Also, as a non-employee director of the Company,

22  defendant Brenner receives an option to purchase 12,000 shares of common stock of the Company

23  the first business day after each annual meeting and an additional option for 1,000 shares based on

24  his participation on the Audit Committee. In addition to his dominance and control over Blue

25

26  Rhino as a result of his stock ownership and position as a director of the Company, defendant

27  Muehlstein also has longstanding personal and professional entanglements and relationships with

28

- 13 -

1   other Board members, which have prevented them and is preventing him from acting independently

2   to fulfill the fiduciary duties owed to Blue Rhino and its shareholders, including:

3

4           i.      Defendant Muehlstein is a member of the Company's Audit Committee, along

5   with defendants Brenner, Lunn and Warnock. They were charged with, among other things,

6   ensuring that the Company had proper accounting procedures and controls in place so as to

7   guarantee that the Company was properly accounting for its assets and ensuring that the Company's

8   financial statements presented an accurate representation of the Company's financial position at all

9   times during the Relevant Period, which they did not.

10

11          ii.     Defendant Muehlstein is the managing partner of the law firm of Pedersen

12  & Houpt, P.C. During fiscal 2002, defendant Muehlstein's law firm was paid $67,956 by the

13  Company for legal work performed on behalf of Blue Rhino.

14

15      20.     Defendant Tim Scronce ("Scronce") is, and at all times relevant to the allegations

16  raised herein, was Chief Operating Officer of the Company. As of November 2002, defendant

17  Scronce was named President of the Company. According to the Company's FY:02 Proxy

18  Statement, as of November 8, 2002, Scronce owned or controlled over 24,010 shares of Blue Rhino

19
    stock. In exchange for his purported loyalty and fidelity, defendant Scronce received the following

20
    very significant compensation package from Blue Rhino during FY:02: salary – $175,846; bonus

21

22  – $99,804; other compensation - $94,412, as well as the option to purchase 100,000 shares of Blue

23  Rhino stock.

24

25      21.     The defendants named in ¶¶ 12-19 are sometimes collectively referred to herein as

26  the "Director Defendants." The defendants named in ¶¶ 12-20 are sometimes collectively referred

27  to herein as the "Individual Defendants."

28

1    22.    According to Blue Rhino's FY:02 Proxy Statement, non-employee directors were

2    also well compensated to assure their allegiance to the Company and its shareholders. Pursuant to

3    Blue Rhino's FY:02 Proxy Statement, upon the conclusion of each of the Company's annual

4
5    stockholders' meetings, each continuing non-employee director is automatically granted an option

6    of 12,000 shares of the Company's common stock. Directors who serve on committees receive an

7    additional option to purchase 1,000 shares.

8
     23.    The Individual Defendants owed the Company and its public shareholders the duty
9
10   to exercise a high degree of due care, loyalty, and diligence in the management and administration

11   of the affairs of the Company, as well as in the use and preservation of its property and assets. The

12   conduct of defendants complained of herein involves a knowing and culpable violation of their

13   obligations as directors and/or officers of Blue Rhino, the absence of good faith on their part, and

14   a reckless disregard for their duties to the Company and its shareholders, which the defendants were

15
     aware or should have been aware posed a risk of serious injury to the Company.
16

17   24.    Notwithstanding their positions of trust and fidelity, and in violation of California

18   law, during the period between August 20, 2002 and December 3, 2002 while in the possession of

19   materially adverse non-public information regarding Blue Rhino, certain defendants and entities

20
21   controlled by certain defendants, either sold or acquiesced in and/or permitted the sale of significant

22   amounts of Company stock by the officers and/or insiders of the Company, in the amounts indicated

23   below:

24

| NAME | DATE | SHARES SOLD | PRICE | PROCEEDS |
|------|------|-------------|-------|----------|
| **Lunn** | 09/20/02 | 17,734 | $14.116 | $ 250,333.00 |
| | 12/03/02 | 2,000 | $18.00 | 36,000.00 |
| **Warnock** | 12/02/02 - 12/03/02 | 75,000 | $17.94 - 19.69 | 1,411,000.00 |

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Warnock/ Camden Partners Str. Fund | 12/02/02- 12/03/02 | 72,750 | $17.94 - 19.69 | $1,369,000.00 |
|---|---|---|---|---|
| Warnock/ Cahill Warnock SPFLP | 12/02/02- 12/03/02 | 2,250 | $17.94 | $40,369.00 |
| **TOTAL** | | **169,734** | | **$3,106,702.00** |

25. In contrast to the actions taken by defendants as alleged herein, including the sale of millions of dollars worth of their Blue Rhino shares while in possession of material adverse information, to properly discharge the aforesaid duties, defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of the Company pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position. The Individual Defendants were required, among other things:

- To, in good faith, manage, conduct, supervise and direct the business and affairs of Blue Rhino carefully and prudently and in accordance with the laws of whichever state controls its "internal affairs," the laws of the United States and the rules and regulations and the charter and by-laws of Blue Rhino;

- To neither violate nor knowingly permit any officer, director or employee of Blue Rhino to violate applicable federal and state laws, rules and regulations or any rule or regulation of Blue Rhino;

- To exercise reasonable control and supervision over the public statements to the securities markets and trading in Blue Rhino stock by the officers and employees of Blue Rhino;

- 16 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      •     To remain informed as to the status of Blue Rhino's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the federal securities laws;

2

3

4

5      •     To supervise the preparation, filing and/or dissemination of any SEC filings, press releases, audits, reports or other information required by law, to examine and evaluate any reports or examinations, audits, or other financial information concerning the financial condition of Blue Rhino and to cause Blue Rhino to obey and comply with and not violate the federal or state securities laws;

6

7

8

9      •     To ensure that Blue Rhino was operated in a diligent, honest and prudent manner in compliance with all applicable federal and state laws, rules and regulations;

10

11      •     To maintain and implement an adequate system of controls and information systems, such that no officer, director or employee of the Corporation would make false statements about Blue Rhino to the securities markets or would be able to misappropriate internal confidential information for his or her own benefit and profit, by insider stock trading or otherwise; and

12

13

14

15      •     To ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

16

17

    26.     The Individual Defendants, particularly the members of the Audit Committee,

18

19 were responsible for maintaining and establishing adequate internal accounting controls for Blue

20 Rhino and to ensure that the Company's financial statements were based on accurate financial

21 information. According to GAAP, to accomplish the objectives of accurately recording, processing,

22 summarizing, and reporting financial data, a corporation must establish an internal accounting

23

24 control structure. Among other things, the Individual Defendants were required to:

25     1.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

26

27

28

2. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

    a. transactions are executed in accordance with management's general of specific authorization;

    b. transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

27. Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

28. According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions."

29. Blue Rhino's Audit Committee Charter applicable during the relevant period of time provided, *inter alia*:

The Audit Committee shall provide assistance to the Board of Directors in fulfilling their oversight responsibility to the shareholders, potential shareholders, the investment community, and others relating to the Company's financial statements and the financial reporting process, the systems of internal accounting and financial controls, the internal audit function (if applicable), the annual independent audit of the Company's financial statements, and the legal compliance and ethics programs

- 18 -

as established by management and the Board of Directors. In so doing, it is the responsibility of the Audit Committee to maintain free and open communication between the committee, the independent auditors, the internal auditors and management of the Company.

* * *

The primary responsibility of the Audit Committee is to oversee the Company's financial reporting process on behalf of the Board of Directors and report the results of their activities. Management is responsible for preparing the Company's financial statements, and the independent auditors are responsible for auditing those financial statements. In carrying out its responsibilities, the Audit Committee believes its policies and procedures should remain flexible in order to best react to changing conditions and circumstances. The Audit Committee should take the appropriate actions to set the overall corporate "tone" for quality financial reporting, sound business risk practices, and ethical behavior.

30.    Moreover, the Audit Committee Charter required that members of the Audit Committee be independent. According to the very rules set forth by defendants, a board member is considered independent if they have no relationship that may interfere with the exercise of their independence from management and the Company. Clearly, as set forth herein, defendants Brenner, Lunn, Warnock and Muehlstein were inextricably intertwined with the other defendants such that the requisite independence was not possible.

31.    Interestingly, in September 2003, defendants caused the Company to amend the Audit

Committee Charter in an apparent effort to dilute the responsibilities of the Audit Committee by stating, *inter alia*, that the Audit Committee "serves a board oversight role where it oversees the relationship with the independent auditor . . . and provides advice, counsel and general direction, as it deems appropriate, to management and the auditors on th basis of information it receives, discussions with the auditor, and the experience of the Committee's members in business, financial and accounting matters."

- 19 -

32.     As alleged in detail below, the Individual Defendants, particularly the members of the

Audit Committee, failed to implement and maintain an adequate internal accounting control system for Blue Rhino, and thereby violated: (i) their fiduciary duties of loyalty and good faith; (ii) GAAP; and (iii) the Audit Committee Charter.

33.     The Individual Defendants further breached their duties of loyalty and good faith by: (i) causing or allowing the Company to conduct its business in an unsafe, imprudent, and unlawful manner; and (ii) causing the Company to suffer damages, as alleged herein.

34.     Defendants, as corporate officers and/or directors, owed Blue Rhino and its shareholders the duty of due care in the performance of their responsibilities with respect to Blue Rhino's operations. Each defendant in this action, individually or jointly, as hereinbefore alleged, failed to exercise reasonable diligence and due care, was grossly negligent or reckless, and committed one or more of the following actions or omissions constituting breaches of fiduciary duty:

- Defendants Lunn and Warnock, as well as two entities in which defendant Warnock has a controlling interest, with the acquiescence, authority and/or permission of the Board, misused proprietary non-public corporate information to profit by over $3.1 million by insider selling the Company's stock in violation of Company policies and rules against such misuse of information or sales and in violation of federal and state laws as well;

- Defendants authorized, caused or permitted Blue Rhino to conduct its business in an unsafe, imprudent and dangerous manner by pursuing unsound practices, including concealing the true nature of their reckless, unsafe and unsound accounting practices and the serious adverse impact of these practices on Blue Rhino's financial condition and prospects;

- Defendants authorized, caused or permitted Blue Rhino to operate and report information in a manner which was contrary to federal and state regulations, thus exposing it to liability for violation of the federal securities laws for which the Company has been sued in a class action in federal court in California; and

- 20 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Defendants' conduct as alleged herein has also damaged Blue Rhino by exposing it to the cost of the defense of and possible cost of liability for violation of the federal securities laws as a result of the securities class action lawsuits now pending against it in federal court, damage to the goodwill and reputation of Blue Rhino due to the negative adverse publicity that their actions have generated, and they have impaired Blue Rhino's ability to raise capital at a reasonable and/or low cost as the Corporation's credit rating has been adversely affected, and its cost of capital has therefore increased, to the harm of the Corporation.

35. By reason of their corporate positions and their ability to control the business and corporate affairs of Blue Rhino at all relevant times, defendants owed Blue Rhino and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control Blue Rhino in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Blue Rhino and its stockholders and not in furtherance of their own personal interests. In addition, each director owed Blue Rhino, while he or she occupied such directorship, the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of Blue Rhino and in the use and preservation of its property and assets. In violation of their fiduciary duties, defendants permitted and/or caused Blue Rhino to conduct its business in an unsafe, imprudent and dangerous manner by violating the federal securities laws and permitting certain insiders to misappropriate and misuse confidential non-public corporate information for their personal profit.

36. Defendants participated in the wrongdoing complained of herein in order to improperly benefit themselves by remaining as officers and/or directors of a large corporation and to continue and prolong the illusion of the Company's success, to inflate the price of its common stock, and to conceal the adverse facts concerning defendants' wrongful conduct, and Blue Rhino's management, financial position and future prospects so that they could: (a) protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby; and (b) inflate the price of the Company's common stock in order

- 21 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | to enhance the value of their securities holdings and options to purchase Blue Rhino stock and to
2 | allow certain insiders to liquidate approximately \$3.1 million of Blue Rhino stock, while in
3 | possession of material adverse non-public information. Such participation involved, among other
4 |
5 | things, planning and creating (or causing to be planned and created), proposing (or causing the
6 | proposal of) and authorizing, approving and acquiescing in the conduct complained of herein.

7 |      37.    As members of the Board of Directors of Blue Rhino, the directors named herein as
8 | defendants were themselves directly responsible for authorizing or permitting the authorization of,
9 | or failing to monitor, the practices which resulted in the misappropriation of confidential corporate
10 |
11 | information and violation of the federal securities laws as alleged herein. Each of them had
12 | knowledge of and actively participated in and approved of the wrongdoings alleged or abdicated
13 | his or her responsibilities with respect to these wrongdoings. The alleged acts of wrongdoing
14 | subjected Blue Rhino to unreasonable risks of loss.

15 |      38.    By reason of their membership on the Blue Rhino Board of Directors and positions
16 |
17 | as executive officers of the Company, the defendants were each controlling persons of Blue Rhino
18 | and had the power and influence to cause, and did cause, the Company to engage in and/or permit
19 | the conduct complained of herein.

20 |      **Substantive Allegations**

21 |      39.    Blue Rhino purports to be a leading national provider of propane gas and propane gas
22 |
23 | accessories, including a national branded propane cylinder exchange and a complementary products
24 | division. The Company's stock is quoted on the Nasdaq National Market under the symbol RINO.
25 |      40.    On August 15, 2002, defendants caused Blue Rhino to issue a press release
26 |     announcing
27 |
28 |

- 22 -

1   that the Company had beat prior earnings guidance, and raised estimates for its fiscal year 2002,

2   stating also that Blue Rhino's business was stronger than ever and that the Company was poised for

3   success, as follows:

4

5   Blue Rhino Expects Fiscal-Year Earnings to Exceed Estimates
    The better-than-expected results are largely due to ***stronger-than-anticipated***
6   ***demand for Blue Rhino's cylinder exchange services***, which drove fiscal-year
    revenue above $200 million. The expected increase of more than 40% from $138
7   million in the prior fiscal year exceeds the high end of previous guidance.
                        *       *       *
8   "Our preliminary results demonstrate the consumers' strong appetite for the
9   convenience of our cylinder exchange program, combined with the commitment of
    our retail customers and ***the ability of our distributors and employees to execute***
10  ***on our business plan***," said Billy D. Prim, chairman and chief executive officer.
    "***We see consumer demand for our exchange service being stimulated by the new***
11  ***fire safety standard that requires overfill protection valves on all 20 lb. propane***
    ***cylinders***. Our Blue Rhino exchange service is a convenient, safe solution to
12  replacing cylinders that have been made obsolete by this new safety standard, and
13  our research suggests that we will retain at least 80 percent of new customers who
    try our service. ***We expect the new safety standards will continue to impact our***
14  ***results over the next 18 to 24 months as consumers continue to replace obsolete***
15  ***cylinders***." [Emphasis added.]

16      41.     After the issuance of the Company's August 15, 2002 release, shares of Blue Rhino

17  common stock surged almost 15% in intra-day trading, trading to a high of $12.95 per share on

18  August 15, 2002, compared to the prior day's close of $11.30 per share. Unknown to investors,

19  however, the statements contained in this release were materially false and misleading and were
20
    known by Defendants to be false at the time of publication, or were recklessly disregarded as such
21
22  thereby, for the following reasons, among others:

23          a.      While Defendants claimed that business was strong and was expected to

24  continue as such in the foreseeable future, Defendants knew or recklessly disregarded the fact that
25
    at least the two largest of the Company's distributors were performing so far below plan that Blue
26
27  Rhino was planning to acquire them;

28          b.      The two failing distributors, Ark and Platinum, accountable for at least 40%

- 23 -

1   of the Company's distribution, had lost over \$2.8 million on a combined basis for the first 10

2   months of fiscal 2002, compared to a loss of only \$1.2 million for all of fiscal 2001;

3
4           c.      Platinum had performed so poorly for the year that it was actually in

5   violation of its loan covenants on its credit line with Southern Community Bank, including the

6   requirement that Platinum have a minimum net wort of \$550,000.00 as of December 31, 2001. In

7   fact, as of December 31, 2001, Ark and Platinum had a combined net worth of negative \$5.1

8   million;

9
10          d.      Ark and Platinum already owed Blue Rhino at least \$5 million in cash

11  advances and an additional \$2.8 million in debt, representing 61% of their total liabilities, which

12  money Blue Rhino was at risk of losing if these distributors failed completely;

13          e.      That Defendants had misrepresented that the purchase price of the

14  acquisitions of the distributors only totaled \$21 million when, in fact, the true price of the

15  acquisition was \$32

16  million ; and

17

18          f.      Contrary to Defendants' statements that overfill prevention device

19  regulations ("OPD Regulations") were continuing to result in robust demand for Blue Rhino

20  products, Defendants were already beginning to see the end of the positive impact of the OPD

21  Regulation, such that they  lacked a reasonable basis to claim that demand would foreseeably

22  continue to remain at then current levels, and lacked a reasonable basis not to adjust downward

23
24  estimates at this time.

25          42.     On September 17, 2002, defendants caused Blue Rhino to publish another press

26  release announcing "record" results for the fourth fiscal quarter and full fiscal year 2002, the period

27

28

- 24 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 │ ended July 31, 2002. In addition, defendants also used this release to announce Blue Rhino's

2 │ intention to acquire certain of its distributors, and stated, in part, the following:

3

4 │ Blue Rhino Corporation... today announced financial results for the fourth quarter
and fiscal year ended July 31, 2002. Net revenues for the fourth quarter increased

5 │ 72 percent to a record $71.3 million from $41.6 million for the same period a year
ago. Revenues from the company's cylinder exchange business rose 81 percent, and

6 │ revenues from its complementary propane-fueled products business increased 32
percent. Cylinder exchange represented approximately 85 percent of total revenue,

7 │ compared with 80 percent a year ago, while products were approximately 15 percent
of total revenue, compared with 20 percent in the prior year.

8 │ 　　　　　　*　　*　　*

9 │ Commenting on the results, [defendant] Prim said: "*The fourth-quarter
performance demonstrates that we continued to execute our plan to leverage our*

10 │ *industry leadership by capitalizing on the growing trend in consumer preference
for cylinder exchange over refill, using our extensive retail relationships to cross*

11 │ *merchandise our complementary propane-related products, and leveraging our
established infrastructure which we believe is the most advanced and efficient*

12 │ *direct-store delivery system servicing retailers today.*"

13 │ 　　　　　　*　　*　　*

14 │ Prim continued, "*We currently anticipate double-digit growth in the number of
cylinders transacted for at least the next three fiscal years*, which will help

15 │ continue to drive revenue growth."

16

17 │ 　　"Cylinder exchange has benefitted from the new National Fire Protection
Association guidelines that went into effect April 1 mandating that all cylinders be

18 │ equipped with an Overfill Protection Device (OPD) before they can be refilled,"
Prim said. "*We expect these guidelines to continue to impact our results for the*

19 │ *next 18 to 24 months. The OPD requirement prompts consumers to try cylinder
exchange, and our studies suggest that at least 80 percent of those trying cylinder*

20 │ *exchange stick with it.*"

21 │ 　　　　　　*　　*　　*

　　[Defendant Prim stated, in part, that,] "Sales of propane-fueled products

22 │ serve to strengthen our core cylinder-exchange business through recurring sales of
propane cylinders to fuel the products. Our growth strategy includes continuing to

23 │ expand our propane-fueled products business to leverage our extensive retail
relationships."

24

25 │ Regarding the acquisition of its nine distributors – which Defendants stated were expected to further

26 │ improve operating results – this release also stated the following:

27 │ 　　*Blue Rhino also announced that it has reached agreement in principle on*

28 │ *the financial terms on which it would acquire nine distributors in major*

- 25 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
*metropolitan areas across the United States*.... If the acquisitions are completed, Blue Rhino would control distribution territories *responsible for approximately 45 percent of its current cylinder exchange revenues*.

3
4
5
6
"The strategic acquisition of these distributors would provide Blue Rhino more control over our enterprise that we believe will *enable us to further improve operating results and to increase stockholder value*," said Prim. "We currently intend to continue to partner with independent distributors in many markets where the distributor model remains the most efficient means of serving our retail customers."

7    In addition to the foregoing, this release also provided purported "Guidance for Fiscal 2003," as

8    follows:

9
10
11
12
"*Looking forward to fiscal year 2003, we continue to expect strong growth in the recurring cylinder exchange business*," Prim said. "We believe Blue Rhino is well positioned to continue to benefit from the safety initiative that went into effect in April, since cylinder exchange represents the simplest way for consumers to upgrade their cylinders...."

\*   \*   \*

13

14
15
16
*For the fiscal year ending July 31, 2003, Blue Rhino currently expects revenues of $240 million to $245 million, resulting in earnings per share of $0.85 to $0.88* and EBITDA of $29 million to $30 million. The mix of revenues for the full year is expected to be approximately 60% from cylinder exchange and 40% from products.

17    43.    In addition to the foregoing, at the time the Ark and Platinum acquisitions were

18    announced, Defendants stated and/or provided the following guidance:

19

20
21
22
That, while the full terms of the distributor acquisition were not made known, at the time the distribution acquisition was announced defendants told investors that the acquisitions would be paid for with stock and assumed debt *valued at approximately $21 million; including the issuance of 1.1 million shares of common stock plus $2.5 million in cash*.

23
That, the estimated purchase price of $21 million was approximately 5x-6x EBITDA for the acquisitions.

24
That, the primary purpose of the acquisitions was to increase the Company's control over its distribution channel.

25
That, at the time the acquisition was announced, Ark and Platinum were strong, healthy, highly profitable and independent of Blue Rhino.

26
27
That, since both Ark Propane and Platinum Propane were holding companies originally founded by the Company's CEO and Vice Chairman in the early 1990's, yet which were fully divested several years prior to the acquisitions, management

28

- 26 -
SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    of Blue Rhino was very familiar with these companies and that their integration
2    would foreseeably be seamless.

3    44.    On November 21, 2002, defendants caused the Company to publish a release

4    announcing that it had completed a new $60 million credit facility at a reduced interest rate from

5    its pre-existing $41.5 million facility that would have expired on August 1, 2003. Participating

6    banks included LaSalle Bank National Association, RBC Centura Bank, and SunTrust Bank. The
7
8    new credit facility purportedly consisted of a $45 million revolving loan and a $15 million term

9    loan, both for general corporate purposes. As compared to the Company's current facility, the new

10   facility extended expiration to November 2005 and reduced interest rates 25 basis points.

11   According to defendant Castaneda:

12
13          This new bank facility, "illustrates the confidence lending
            institutions have in our future business and reflects improvement in
14          our credit quality driven by our operating results. The facility, which
            was increased due to strong demand from the lenders by $10 million
15          from the $50 million facility that we originally were seeking, should
            continue to reduce our interest costs while providing more flexibility
16          to execute our growth plan."

17   45.    Announcing a reduction in the Company's interest rate also had the effect of causing

18   shares of Blue Rhino to rise, and on November 21, 2002, shares of Blue Rhino closed at $16.22 per
19
20   share. Unknown to investors, however, the statements contained in this release were materially

21   false and misleading and were known by Defendants to be false at the time of publication, or were

22   recklessly disregarded as such thereby, for the reasons stated herein in *supra*. In addition, such

23   statements were also materially false and misleading, because defendants knew the Company did

24   not have enough cash from operations to remain fully funded, so that the Company would have to
25
26   engage in other financing, under the guise of repaying debt, to remain fully funded.

27   46.    On or about November 22, 2002, the Company filed with the SEC its yearly Proxy

28

- 27 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    Statement. In this SEC filing, it was reported that the Board of the Company had given defendant

2    Prim a 53% increase in his base salary for fiscal year 2003 – bumping him up to $595,000 per year,

3    compared to his prior base salary of $388,000 the prior year.

4

5    47.    On November 25, 2002, defendants caused the Company to publish a release

6    announcing that Blue Rhino had completed the acquisition of its distributors, as follows:

7            Blue Rhino... today announced the acquisition of ten of its
             distributors in major metropolitan areas across the United States.
8            The territories served by the distributors acquired *represent*
9            *approximately 45 percent of Blue Rhino's cylinder exchange*
             *revenues.*
10                            *    *    *

11           "*These distributors have reached critical mass and we have also
             added the management talent to allow us to effectively run the*
12           *operations.* Our acquisition of these distributors in major markets
             will provide us more control over our enterprise, which we believe
13           will *enable us to improve operating results and increase*
             *stockholder value...* ," added [defendant] Prim.
14           *Blue Rhino currently expects the acquisitions to be accretive to*
15           *future earnings for the remainder of fiscal 2003 by between $0.01*
             *and $0.03 per diluted share, weighted primarily in the fourth fiscal*
16           *quarter, and thereafter on an annualized basis by between $0.02*
             *and $0.04 per diluted share, and to be accretive to earnings* before
17           interest, depreciation and amortization (EBITDA) *by approximately*
18           *$2.9 million in fiscal 2003 and thereafter by approximately $3.5*
             *million annually.* Blue Rhino also currently expects the acquisitions
19           to have an approximately *$2 million negative impact on annual*
             *revenues* as a result of the elimination of lease revenues to the
20           distributors.
             *The consideration paid by Blue Rhino in the acquisitions consisted*
21           *of 1,104,196 restricted shares of Blue Rhino's common stock,*
22           *valued at approximately $17 million based on a thirty-day pricing*
             *period ending on November 1, 2002, and approximately*
23           *$3,331,172 in assumed debt satisfied at closing.*
             The distributors purchased include Platinum Propane, L.L.C. and
24           five distributors owned by it, with operations in Southern California,
25           including Los Angeles and San Diego, Chicago, the Carolinas,
             Georgia and Florida. The remaining five distributors were owned by
26           Ark Holding Company, L.L.C. with operations in New Jersey,
             Seattle, Kansas City, Denver and Salt Lake City.
27
28           The operational management will be retained.

                                    - 28 -

1
2
3
4

*"We expect greater leverage in operating margins as our distributors continue to benefit from strong same-store sales growth, which reduces operating costs per unit. "We expect little integration risk as we are using the same operational management and same transactional technology,"* added Prim. [Emphasis added.]

5
6
7
8
9
10
11

48.   News of the closing of these acquisitions also caused shares of the Company to rise, and Blue Rhino stock closed at $17.50 on November 26, 2002. Within three days, shares of Blue Rhino traded above $19.00. Unknown to investors, however, the statements contained in this release were materially false and misleading and were known by Defendants to be false at the time of publication, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶ 41(a)-(f), *supra*.

12
13
14
15

49.   On November 26, 2002, defendants caused the Company to publish a release announcing "record" results for the first quarter of fiscal 2003, the period September 31, 2002, as follows:

16
17
18
19
20

Blue Rhino Corporation ... today announced that *first-quarter net income rose more than eleven-fold on a 50% rise in revenues from a year ago*, as the company continued to experience strong demand for cylinder exchange.
For the fiscal first quarter ended October 31, 2002, Blue Rhino reported net income of $1.2 million, or $0.07 per fully diluted share, on record revenues of $54.8 million. This compared with net income of $107,000, or $0.01 per share, on revenues of $36.5 million for the same period a year ago....

21
22
23
24
25

*"We continued to execute our growth plan during the fiscal first quarter," said [defendant] Prim. "We are well positioned to leverage our industry leadership* by capitalizing on the growing trend in consumer preference for cylinder exchange over refill using our extensive retail relationships to cross-merchandise our complementary propane-related products, and leveraging our established infrastructure which we believe is the most advanced and efficient direct-store delivery system servicing retailers today."

26
27
28

*"The trend toward cylinder exchange continues to be fueled by a combination of factors that we believe bode well for us," Prim said. "These include the adoption in many states of National Fire Protection Association guidelines mandating the installation of an overfill prevention device on all cylinders refilled after April 1, 2002*, as well as support by large retailers seeking to make the purchase of

- 29 -

1    propane-fueled barbecue grills and other products convenient to their customers by

2    promoting the availability of a full cylinder at the time of purchase."

                                              * * *

3    Guidance Raised for Fiscal 2003

4    *"The acquisition of certain distributors and continued growth ahead of our*

5    *expectations in the recurring cylinder exchange business allowed us to increase our guidance for the remainder of the fiscal year,"* Prim said. For the fiscal

6    second quarter ending January 31, 2003, Blue Rhino currently expects revenues in the range of $40 million to $45 million, resulting in break-even earnings and

7    EBITDA of between $3.4 million to $3.6 million.

8    For the fiscal year ending July 31, 2003, *the company is raising guidance to reflect*

9    *continued strong cylinder exchange results and the projected impact of the acquisition of certain distributors*. Blue Rhino currently expects revenues in the

10   range of $250 million to $255 million, resulting in earnings per share between $0.91 to $0.94 and EBITDA of between $32 million to $35 million.

11

12   Following the publication of these results, Defendants also hosted a conference call during which

13   defendant Prim stated, *"we believe this is another verification that our strategies are sound and*

14   *are working."*

15           50.    The statements contained in the November 26, 2002, Blue Rhino release were

16   materially false and misleading and were known by Defendants to be false at the time of

17

18   publication, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶ 41(a)-

19   (f), *supra*.

20           51.    Significantly, on December 2, 2002 and December 3, 2003, defendants Lunn and

21   Warnock, along with certain entities controlled by defendant Warnock, sold 152,000 shares of Blue

22   Rhino stock to garner over $2.85 million dollars in illicit insider trading proceeds.

23

24           52.    On December 20, 2002, defendants caused the Company to publish a release

25   announcing that Blue Rhino had completed the sale of one million shares valued at a price of

26   $15.79 per share – plus rights to acquire an additional 330,000 shares at the same price within 90

27   days – valued at over $5 million. According to the Company's release, *"the net proceeds from the*

28

- 30 -

1 | *financing will be used to satisfy the Company's existing subordinated debt, which currently bears*

2 | *a 13 percent interest rate.*"

3
4 | 53. Defendants' announcement that the Company had issued private equities and that

5 | it would use the $15 million cash infusion to reduce debt had a positive effect on the Company, and

6 | its share price. Defendants' statements, however, were materially false and misleading because the

7 | Company did not have enough cash from operations to remain fully funded, so that the Company

8 | would not use this money to pay down existing debt, but rather to fund existing operations and help

9 | infuse cash into its money-losing acquisitions.

10
11 | 54. On January 7, 2003, Dow Jones reported that Blue Rhino had registered for sale

12 | over

13 | 1.3 million shares of common stock on behalf of two shareholders, the majority of which had been

14 | issued just weeks before in the private placement referenced above. Apparently, these two

15 | shareholders (Mainfield Enterprises, Inc. (798,000 shares) and Smithfield Fiduciary, LLC (532,000

16
17 | shares)) demanded the sale of their Blue Rhino shares before the revelation of defendants' fraud.

18 | **The Truth is Revealed**

19 | 55. On or about February 5, 2003, the Company shocked investors when it filed with the

20 | SEC, pursuant to Form 8-K, its combined balance sheet, which accounted for the recently

21 | completed acquisitions of Platinum Propane Holdings and Ark Holdings, and stated, in part, the

22 | following:

23

24 | The closing date for the acquisitions of Platinum Propane, L.L.C. and Ark Holding Company LLC and their respective subsidiaries by Blue Rhino was November 22,

25 | 2002. *The aggregate purchase price for the two acquisitions was approximately*

26 | *$32 million.* The consideration paid by Blue Rhino in the two acquisitions consisted of approximately *1.1 million restricted shares of common stock valued,*

27 | *based on the closing price of Blue Rhino's common stock on the Nasdaq National Market on November 22, 2002, at approximately $19 million, $3.1 million in*

28 | *assumed debt satisfied at closing, $4.9 million in advances, and $5.0 million in*

- 31 -
SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1      *liabilities assumed*.... Under the purchase method of accounting, the purchase price
2      is allocated to the assets acquired and liabilities assumed based on their respective
     fair values. On a preliminary basis, *approximately $28.2 million of the purchase*
3      *price was allocated to goodwill*, with the balance allocated to equipment, vehicles
     and other assets. The allocation of the aggregate purchase price to the assets and
4      liabilities acquired is based upon their estimated fair values. The allocation of the
     aggregate purchase price reflected in the pro forma financial information is
5      preliminary. The final allocation of the purchase price is not expected to differ
6      materially from the preliminary allocation.

7 Additionally, the Defendants caused the Company to report, in its unaudited pro forma statement,

8 that the distributors had a net loss of $2.8 million, which was drastically different than what had

9 been represented by the Defendants in the Company's November 25, 2003 press release.
10
11 Furthermore, Defendants caused the Company to report that Platinum was in violation of its debt

12 covenants and that the distributors owed Blue Rhino $5 million in cash advances in addition to the

13 current debt of $2.8 million.

14      56.     While the Company had made no public disclosures that would explain the decline

15 in the price of Blue Rhino stock prior to this time, following the publication of the Company's Form
16
17 8-K, the next day, February 5, 2003, shares of Blue Rhino traded below $12.50, and the following

18 day, as investors further digested this information, shares of the Company traded even lower, falling

19 to a low of $9.65 on February 7, 2003. This material decline in the price of Blue Rhino shares,

20 caused a loss of over 50% from a high of $20.75 reached only weeks before.

21      57.     During the rapid decline in the price of Blue Rhino shares, on February 6, 2003,
22
23 defendants were forced to have the Company publish a release purporting to provide an explanation

24 for the "unusual trading" surrounding its stock, by claiming that there was no reason for this sudden

25 price decline, as follows:

26      Blue Rhino Corporation ... *today commented on the unusual trading volume in its*
27      *stock.*

28

- 32 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*"We are unaware of the reason for the recent volume of trading in our stock,"* stated [defendant] Prim. "We reaffirm our previous guidance for the fiscal year of revenues in the range of $250 million to $255 million, resulting in earnings per share between $0.91 to $0.94 and EBITDA of between $32 million to $35 million, and remain comfortable with the second quarter."

58.     On February 25, 2003, defendants caused Blue Rhino to publish a release announcing results for the second fiscal quarter 2003, the period ended June 31, 2003, and which stated, in part, the following:

> Blue Rhino Corporation... today announced that net income increased to $916,000, or $0.05 per fully diluted share, for its fiscal second quarter ended January 31, 2003, from a loss of ($732,000), or ($0.06) per fully diluted share, for the second quarter of last year.

> The increase was driven by revenues of $58.1 million, a record for the second quarter and a 50% rise from revenues of $38.8 million in same period a year ago, as the company continued to experience stronger-than-expected demand in its cylinder exchange segment. Earnings before interest, taxes, depreciation and amortization (EBITDA) increased to $4.6 million from $3.7 million for the same period in the prior year. Blue Rhino's second quarter is historically its slowest due to the seasonality of its propane cylinder exchange business..

59.     Defendants materially misled the investing public, thereby inflating the price of Blue Rhino's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

**Members of the Audit Committee Abdicate Their Oversight Responsibilities**.

60.     Throughout 2002, the members of the Audit Committee, defendants Brenner, Lunn, Warnock and Muehlstein received or should have received numerous reports regarding the business affairs of the Company and the manner by which defendants were improperly recognizing revenue relating to software licenses. Indeed, in FY:02, the Audit Committee held three (3) meetings, yet

- 33 -

1  it never took any action as the defendants caused the Company to issue false and misleading

2  financial reports that failed to acknowledge the improper accounting procedures in place. If the

3
4  defendants on the Audit Committee had been properly discharging their duties, they would have

5  found the "red flags" which indicated that defendants were causing Blue Rhino to make false and

6  misleading statements to the investing public including: (1) that certain distributors acquired by the

7  Company on November 22, 2002 were not healthy, highly profitable, and independent of the

8  Company, as portrayed by the Defendants. In fact, the distributors acquired by Blue Rhino had lost

9  $2.8 million in the first ten (10) months of 2002 alone and owed Blue Rhino $5 million in cash

10
11  advances in addition to the $2.8 million in debt. Also, one of the acquired distributors was in

12  violation of its debt covenants for 2001; (2) defendants overstated the true value of Ark and

13  Platinum, which had been artificially inflated and propped up with undisclosed loans guaranteed

14  by defendants – which loans were paid and which guarantees were entirely wiped out by the

15  acquisition of Ark and Platinum by Blue Rhino; (3) that Defendants misrepresented that the

16
17  purchase price of the acquired distributors only totaled $21 million when in fact the true price of

18  the acquisition was $32 million; (4) that the Company was beginning to see a decline in earnings

19  from the Overfill Protection Device ("OPD") regulations; (5) that the Company's earnings

20  projections were lacking in any reasonable basis when made; and (6) that the false and misleading

21
22  information disseminated by Defendants caused the Company stock to trade at artificially inflated

23  prices.

24  61.    In breach of both their fiduciary duty of good faith and their responsibilities

25  pursuant to the Audit Committee Charter, the members of the Audit Committee wilfully ignored

26  the obvious and pervasive problems with Blue Rhino's accounting and revenue recognition

27  practices. The members of the Audit Committee made no effort to establish and maintain adequate

28

- 34 -

internal controls for the Company to ensure that the Company's financial results were calculated and recorded in accordance with GAAP. Apparently concerned with their failures in FY02 and their possible liability therefor, the Audit Committee met fourteen (14) times in FY03. Nevertheless, Plaintiff is not aware of any recommendation or action by the Audit Committee against any of the defendants herein.

62. The foregoing misconduct of defendants Brenner, Lunn, Warnock and Muehlstein, caused Blue Rhino to suffer damages, including, but not limited to, downgrading of the Company's credit ratings, loss of credibility in the market and the necessity to defend various class action lawsuits pending in federal court in California.

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

## Illicit and Illegal Insider Trading

3

4

63.     Defendants own significant amounts of Blue Rhino stock and/or hold millions of

5 vested options to purchase Blue Rhino stock. This huge equity stake gave defendants a very strong

6 motive to do everything they could to keep Blue Rhino's stock price up, including the false and

7 misleading statements set forth in paragraphs 41(a)-(f), *supra*. These top insiders engaged in this

8 activity because they knew they faced little or no individual risk as, if they were caught and sued,

9

10 they would be protected by huge amounts of directors' and officers' liability insurance (purchased

11 not with their funds, but rather with Blue Rhino's stockholders' monies and with Blue Rhino's own

12 assets), which they could use to defend themselves and settle any securities suits.

13

64.     While purchasers of Blue Rhino's securities during the Relevant Period have

14 suffered significant losses, Blue Rhino's insiders did not fare nearly so badly. Two insiders,

15 defendants Lunn and Warnock, as well as two entities controlled by Warnock, unloaded 169,734

16

17 shares of the Company's stock between August 20, 2002 and December 3, 2002 (with more than

18 150,000 of the shares being sold on December 2, 2002 and December 3, 2002), pocketing over $3.1

19 million in illegal insider trading proceeds, as shown below:

20

21

22

23

24

25

26

27

| NAME | DATE | SHARES SOLD | PRICE | PROCEEDS |
|---|---|---|---|---|
| **Lunn** | 09/20/02 | 17,734 | $14.116 | $ 250,333.00 |
| | 12/03/02 | 2,000 | $18.00 | 36,000.00 |
| **Warnock** | 12/02/02 - 12/03/02 | 75,000 | $17.94 - 19.69 | 1,411,000.00 |
| **Warnock/ Camden Partners Str. Fund** | 12/02/02- 12/03/02 | 72,750 | $17.94 - 19.69 | $1,369,000.00 |

28

- 36 -

| Warnock/<br>Cahill<br>Warnock<br>SPFLP | 12/02/02-<br>12/03/02 | 2,250 | $17.94 | $40,369.00 |
|---|---|---|---|---|
| **TOTAL** | | **169,734** | | **$3,106,702.00** |

65.     Defendants inflated the price of Blue Rhino shares by issuing false and materially misleading statements that allowed the defendants to (i) deceive the investing public regarding Blue Rhino's business, operations, management and the intrinsic value of Blue Rhino common stock; (ii) enabled Defendants to acquire over $30 million in assets, purchased using artificially inflated Blue Rhino shares, to refinance debt upon more favorable terms with its lenders; (iii) allowed Defendants to sell over 15 million worth of stock in a private placement and then register those shares with a value over $23.8 million  for the two large shareholders that had entered into the private equity deal so that the shares could be sold before the truth regarding defendants' conduct was revealed; and (iv) allowed certain insiders,  along with entities controlled by certain insiders, to sell over 160,000 shares of company stock and garner illegal proceeds of more than 3.1 million. Specifically, within days of announcing the acquisition of Platinum and Ark and the "record results" for the first quarter of FY03, defendants Lunn and Warnock, along with two entities controlled by Warnock, dumped over 150,000 shares of Company stock.

66.     The sale of over $3.1 million of Company stock by insiders of Blue Rhino was unusual in nature and timing, which is strong evidence that defendants acted to capitalize on their material misrepresentations and failure to disclose adverse non-public information.

67.     The insiders' stock sales were also *per se* evidence of defendants' science because they all occurred during the time when the Company was failing to perform as indicated in earlier statements defendants caused the Company to make and defendants had artificially inflated Blue

- 37 -

1    Rhino's financials, and before the time when defendants issued the February 5, 2003 statements

2    which caused the stock price to plummet.

3    68.    Since the time that defendants made their revelations concerning the true financial

4

5    condition and growth prospects of the Company, a disclosure which decimated the price of its stock,

6    several shareholder class action lawsuits have been filed against the Company alleging that Blue

7    Rhino's public disclosures were materially false and misleading and in violation of federal

8    securities laws. These class action lawsuits have been consolidated in the federal court in the

9    Central District of California and will continue to expose the Company to enormous liability and

10

11    costs.

12                        **Defendants' Violations of GAAP Rules**

13    69.    The financial results that defendants caused the Company to announce were in

14            violation

15    of GAAP, and the following principles:

16

17            1.    The principle that "interim financial reporting should be based upon the
                  same
18            accounting principles and practices used to prepare annual financial
       statements"
19            was violated (APB No. 28, ¶ 10);

20            2.    The principle that "financial reporting should provide information that is
                  useful
21            to present to potential investors and creditors and other users in making
22    rational
            investment, credit, and similar decisions" was violated (FASB Statement of
23            Concepts No. 1, ¶34);

24            3.    The principle that "financial reporting should provide information about the
25            economic resources of an enterprise, the claims to those resources, and
            effects of transactions, events and circumstances that change resources
26            and claims to those resources" was violated (FASB Statement of Concepts
            No. 1, ¶40);
27

28            4.    The principle that "financial reporting should provide information about

                        - 38 -
SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    an enterprise's financial performance during a period" was violated
2    (FASB Statement of Concepts No. 1, ¶42);

3    5.   The principle that " completeness, meaning that nothing is left out of
           the information that may be necessary to insure that it validly represents
4          underlying events and conditions" was violated (FASB Statement of
5          Concepts No. 2, ¶79);

6    6.   The principle that "financial reporting should be reliable in that it
           represents what it purports to represent" was violated (FASB
7          Statement of Concepts No. 2, ¶¶58-59);

8    7.   The principle that "conservatism be used as a prudent reaction to
9          uncertainty to try to ensure that uncertainties and risks inherent
           in business situations are adequately considered" was violated
10         (FASB Statement of Concepts No. 2, ¶95); and

11   8.   The principle that "[f]inancial reporting should provide information
12         about how management of an enterprise has discharged
           its stewardship responsibility to owners (stockholders) for
13         the use of enterprise resources entrusted to it.... To the extent
           that management offers securities of the enterprise to the
14         public, it voluntarily accepts wider responsibilities for accountability
15         to prospective investors and to the public in general."
           (FASB Statement of Concepts No. 1, ¶50).

16
17   70.  The adverse information concealed by defendants and detailed above was in

18        violation of

19   Item 303 of Regulation S-K under the federal securities law (17 C.F.R. 229.303).

20   71.  Moreover, the adverse information concealed by defendants and detailed above was

21        in

22   violation of SEC Regulation S-X, which states that "financial statements filed with the SEC which
23
24   are not prepared in compliance with GAAP are presumed to be misleading and inaccurate." SEC

25   Regulation S-X also required that "interim financial statements [i.e., Form 10-Qs] must also comply

26   with GAAP." 17

27   C.F. R. §210.10-01(a).

28

1

2

## Derivative and Futility of Demand Allegations

3

4

72.     Plaintiff brings this action derivatively in the right of and for the benefit of Blue

5     Rhino to redress injuries suffered and to be suffered by Blue Rhino as a direct result of the

6     violations of law, breaches of fiduciary duty, corporate mismanagement, abuse of control, as well

7     as the aiding and abetting thereof, by the Individual Defendants.  Blue Rhino is named as a nominal

8     defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this

9     Court which it would

10

11     not otherwise have.

12     73.     Plaintiff will adequately and fairly represent the interests of Blue Rhino and its

13     shareholders in enforcing and prosecuting their rights.

14     74.     It would be futile to require plaintiff to issue a demand to the Individual Defendants

15     requesting them to take action against themselves and certain senior Blue Rhino executives for their

16

17     intentional or reckless conduct as alleged herein.  Not only would this require them to investigate

18     and bring claims against themselves for their own misconduct, but their actions, to date, prove

19     conclusively that they will not take action.

20     75.     Plaintiff did not make a demand on the Board of Directors of Blue Rhino to bring

21     this action because such demand would be futile given the facts as alleged herein and, therefore,

22     such a demand is excused.

23

24     76.     The directors of Blue Rhino cannot be relied upon to reach a truly independent

25     decision as to whether to commence the demanded actions against themselves and the officers,

26     employees or consultants responsible for the misconduct alleged in this complaint, in that, *inter*

27     *alia*, the Board of Directors is dominated by defendants who were personally and directly involved

28

- 40 -

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  in the misconduct alleged and/or who each approved the actions complained of, and to whose

2  directives and views the Board has consistently acceded and will continue to accede.  This

3  domination of the Board of Directors by certain defendants has impaired the Board's ability to

4
5  validly exercise its business judgment and rendered it incapable of reaching an independent decision

6  as to whether to accept plaintiff's demands.

7  77.  In order to bring this action for breaching their fiduciary duties and engaging in other

8  misconduct, the members of the Blue Rhino Board of Directors would have been required to sue

9  themselves and/or their fellow directors and allies in the top ranks of the Corporation, who are their

10
11  good friends and with whom they have entangling financial alliances, interests and dependencies,

12  which they would not do.  Therefore, the Individual Defendants would not be able to vigorously

13  prosecute any such action.

14  78.  The members of the Blue Rhino Board of Directors receive benefits,  stock options

15  and other emoluments by virtue of their membership on the Board and their control of Blue Rhino.

16
17  They have thus benefitted from the wrongdoing herein alleged and have engaged in such conduct

18  to preserve their positions of control and the perquisites thereof, and are incapable of exercising

19  independent objective judgment in deciding whether to bring this action.  The Board members also

20  have close personal and business ties with each other and are, consequently, interested parties and

21  cannot in good faith exercise independent business judgment to determine whether to bring this

22
23  action against themselves and one another.

24  79.  The composition of Blue Rhino's Board of Directors is designed to (and does) make

25  them dependent on and deferential to defendants Prim and Filipowski who, as a practical matter,

26  control and dominate the process by which directors are selected for nomination or renomination

27  to the Board.  Non-employee directors are given stock options to purchase thousands of shares of

28

- 41 -

1 Blue Rhino stock, the amount of which the officers named as defendants herein are in a position

2 to influence or control. Thus, no non-officer Board member can be independent as he or she has

3 a direct economic incentive to please the top officers and the Board Chairman to stay on the Board.

4

5       80.    Despite their knowledge of these facts, the Defendants intentionally allowed the

6 Company to disseminate false and misleading financial information to the investing public without

7 reasonably assuring themselves that the Company would comply with required accounting

8 procedures and otherwise comply with its legal requirements.

9       81.    The Defendants undertook this course of conduct with intentional and/or reckless

10

11 breach of their fiduciary duties because they were afraid that taking the drastic action that was

12 necessary to correct and address the severe lack of any internal controls would: (a) harm the market

13 price of Blue Rhino's stock; (b) result in the loss of goodwill in the investing community; and (c)

14 jeopardize their personal reputations and financial interests.

15       82.    Plaintiff has not made any demand on the Blue Rhino Board of Directors or its

16

17 shareholders to institute an action against the Defendants for their breach of fiduciary duties and

18 other misconduct since such demand would be a futile and useless act for, *inter alia*, the following

19 reasons:

20       1.    A majority of the Blue Rhino Board of Directors participated in, approved
21 or recklessly disregarded the wrongs complained of herein, which could not have been an exercise
of good faith business judgment.

22

23       2.    Blue Rhino's Board has engaged in a systematic course of conduct pursuant
          to
24 which they have continually favored the interests of Blue Rhino insiders, particularly defendants
Prim, Filipowski, Warnock and Lunn at the direct expense of the Company and its stockholders,
25 which could not have been an exercise of good faith business judgment.

26       3.    Defendants Prim and Filipowski are brothers-in-law that formed the
27 Company in 1994. They, along with defendant Brenner, dominate the Board of Directors. The
three are the sole members of the Executive Committee of the Board of Directors and are
28 empowered to act for the Board. The three defendants are well known and well connected in the

- 42 -

1  Winston-Salem business community. Defendant Prim and Brenner serve together on the Board of
2  Directors of Southern Community Bank and Trust ("Southern Community") which has eight (8)
   branches in Winston-Salem, North Carolina. Indeed, Southern Community was the primary bank
3  for Platinum and its obligations to Southern Community had been unconditionally guaranteed and
   secured by defendants Prim and Filipowski in the principal amount of up to $3,500,000, which
4  amount was paid off when defendants caused Blue Rhino to "acquire" Platinum. Moreover,
5  defendant Prim also serves on the Board of Directors of Brenner Children's Hospital & Health
   Services of the Wake Forest University Baptist Medical Center. The Brenner Children's Hospital
6  is named after the family of defendant Richard A. Brenner, who is a close friend and Winston-
   Salem business associate of defendant Prim. Further, defendant Filipowski, along with defendant
7  Prim each own a 50% stake in Rhino Real Estate, LLC. Since 1994, Blue Rhino leases its offices
   in Winston-Salem from Rhino Real Estate, LLC. The lease requires the Company to pay defendants
8  Prim and Filipowski's company $333,264 per year plus additional expenses and taxes.

9
           3.      Defendant Filipowski was the principal of Platinum Venture Partners, LLP.
10 Prior to the sale of Platinum Venture Partners to Computer Associates, defendant Prim was a
   partner in Platinum Venture Partners. Also, defendant Steven D. Devick was a principal of
11 Platinum Technology International, Inc., the software developer that defendant Filipowski took
12 public in 1991. Defendants Filipowski and Devick were among the principals/directors at Platinum
   Technology that started Platinum Venture partners.

13
           4.      The principal professional occupation of defendant Castaneda is his
14 employment with Blue Rhino, and he owes his position and livelihood to maintaining the good will
15 of defendant Prim who is his management superior. Castaneda has received and continues to
   receive substantial monetary benefits due to his employment with Blue Rhino, including, but not
16 limited to, hundreds of thousands of dollars in salary and cash bonuses, options to purchase shares
   of Blue Rhino common stock, and other compensation and benefits. Accordingly, Castaneda is
17 incapable of considering a demand to initiate and prosecute this action.

18
           5.      Despite their knowledge of the wrongdoing alleged herein, the directors of
19           Blue
   Rhino have not taken action to seek recompense from the wrongdoers who have caused harm to the
20 Company, including, but not limited to, defendants Prim, Filipowski, Lunn and Warnock.

21
           6.      The acts which are complained of herein constitute violations of fiduciary
22           duties
   owed to the Company and its shareholders and violations of law and these acts are incapable of
23 ratification.

24
           7.      The members of the Audit Committee, defendants Brenner, Lunn, Warnock
25 and Muehlstein who comprise a majority of the purported "independent" members of the Board,
   exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have
26 been an exercise of good faith business judgment. There is a substantial likelihood that defendants
   Brenner, Lunn, Warnock and Muehlstein will be held personally liable for their misconduct.
27

28

SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    8.    Each of the Individual Defendants knew of and/or directly benefitted from the wrongdoing complained of herein. Specifically, as a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees, and directors; Defendants knew the adverse non-public information regarding the averments set forth in paragraph 39 (a) - (f), *supra*. While in possession of this material adverse non-public information regarding the Company, defendant Lunn sold 19,734 shares of his Blue Rhino stock, realizing illicit gross proceeds of almost $300,00.00; and defendant Warnock and entities controlled by defendant Warnock sold 150,000 shares of Blue Rhino stock, realizing illicit gross proceeds of over $2.85 million dollars. Accordingly, these selling defendants are directly interested in the subject transactions and therefore are incapable of considering a demand to initiate and prosecute this action.

9.    In order to bring this suit, the Individual Defendants would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do. These inter-related business and personal relationships have developed debilitating conflicts of interest which prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.

10.    A majority of Blue Rhino's Board own substantial amounts of the Company stock and have personally profited from these wrongful acts.

11.    To bring an action against themselves would subject the Defendants to personal liability in the securities class action lawsuits pending, as well as additional liability in future lawsuits that could result from such an action.

12.    Blue Rhino's officers and directors are protected against personal liability by a directors' and officers' liability insurance policy. They caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders of Blue Rhino. However, the directors' and officers' liability insurance policies covering defendants contain provisions which eliminate coverage for any action brought directly by Blue Rhino against these defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if these directors were to sue themselves, no insurance protection would be provided for the derivative claims. Thus, this is a further reason why the Blue Rhino Board will not bring such a suit, for to do so would subject themselves and their colleagues and/or friends to a judgment of millions of dollars that would have to be paid from their individual assets alone. On the other hand, if the claims are brought derivatively, such insurance coverage will provide a basis for the Company to effectuate a recovery.

**Reasonable Doubt Exists That the Blue Rhino Board Is Entitled to the Business Judgment Protection**

83.    For the reasons set forth herein, a reasonable doubt exists that the Board's approval and/or acquiescence to the Company's improper accounting methods and absence of appropriate business controls was the product of a valid exercise of business judgment.

- 44 -

84.    As directors of the Company, the Director Defendants received, or should have received, regular and detailed financial reports and were, or should have been, kept abreast and made familiar with the current financial conditions of the Company.

85.    The directors of the Company served on committees for which they were compensated by way of significant grants of stock options pursuant to which they were specifically vested with duties to closely monitor the business and financial performance of the Company. These committees included the Audit Committee, the Compensation Committee, and Executive Committee

86.    As part of their fiduciary duties, the Director Defendants had an obligation to inform themselves, prior to making a business decision, of all material information reasonably available to them. Certainly, the preceding averments establish that the Blue Rhino Board had and has sufficient information to take action regarding the false and misleading statements being made to the market and the investment community.

87.    Had the Board discharged its duty of reasonable inquiry, it would have been alerted to the facts set forth in ¶ 41(a)-(f).

88.    The Blue Rhino Board of Directors' failure to discharge its duty of inquiry was a gross and reckless disregard of its fiduciary duties to Blue Rhino and its shareholders, and caused the Company harm.

89.    Accordingly, the Defendants, together constituting a majority of the directors on the Board, as of the filing of this complaint, face a substantial likelihood of liability if an action asserting the claims alleged herein is brought against them, thus disabling the Individual Defendants from being capable of making a disinterested, independent decision about whether to prosecute this action. Therefore, demand on the Board would have been futile.

90.    Under all of the circumstances, the Defendants' actions were outrageous and were taken intentionally or, at a minimum, with reckless disregard for the legal rights of Blue Rhino and the legal obligations and duties of the Defendants.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duties For Failure to Establish and Maintain Adequate Accounting Controls

91.    Plaintiff incorporates by reference each of the foregoing allegations.

92..    As alleged in detail herein, each of the Defendants had a duty to Blue Rhino and its shareholders to establish and maintain adequate internal accounting controls to ensure that the Company's financial results were recorded in compliance with GAAP.

93.    The Individual Defendants did not establish and maintain adequate internal accounting controls at Blue Rhino and did not make a good faith effort to do so; thus, they abdicated their fiduciary duty of good faith.

94.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered enormous damages, as alleged herein.

## SECOND CAUSE OF ACTION

### Unjust Enrichment

95.    Plaintiff incorporates by reference each of the foregoing allegations.

96.    As a result of the foregoing conduct, including the huge profits earned in illegal insider trading and the compensation received by the Defendants, defendants have been unjustly enriched at the expense of Blue Rhino and/or have aided and abetted the unjust enrichment of the other Individual Defendants.

1    97.    Blue Rhino and its shareholders have been injured by reason of this unjust

2  enrichment. Plaintiff, as a shareholder and representative of Blue Rhino, seeks damages and other

3  relief for the Company as hereinafter set forth.

4

5                                **THIRD CAUSE OF ACTION**

6              **Against the Insider Selling Defendants for Violation of**
              **California Corporations Code §§25402 and 25502.5**

7

8    98.    Plaintiff incorporates by reference each of the foregoing allegations.

9    99.    At the time that defendants sold their Blue Rhino common stock as set forth herein,

10  by reason of their positions with Blue Rhino, the defendants had access to highly material

11  information regarding the Company, including the information set forth herein regarding the true

12  adverse facts of Blue Rhino's business and financial condition.

13

14   100.   At the time of such sales, that information was not generally available to the public

15  or the securities markets. Had such information been generally available, it would have significantly

16  reduced the market price of Blue Rhino shares at that time.

17   101.   The defendants, and each of them, had actual knowledge of material, adverse non-

18  public information and thus sold their Blue Rhino common stock in violation of California

19
    Corporations Code §25402.
20

21   102.   Blue Rhino has total assets in excess of $1,000,000 and a class of equity securities

22  held of record by 500 or more persons.

23   103.   Pursuant to California Corporations Code §25502.5, the Defendants, and each of

24  them, are liable to Blue Rhino for damages in an amount up to three times the difference between

25  the price at which Blue Rhino common stock was sold by the Defendants, and each of them, and the

26
27  market value which that Blue Rhino common stock would have had at the time of the sale if the

28

                                          - 47 -

1    information known to the defendants, and each of them, had been publicly disseminated prior to that

2    time and a reasonable time had elapsed for the market to absorb the information.

3
     104.    Further, pursuant to California Corporations Code §25502.5, the Defendants, and
4
5    each of them, are liable to the derivative Plaintiff herein for reasonable costs and attorneys' fees in

6    the prosecution of this derivative action on behalf of Blue Rhino.

7    105.    Plaintiff, as a shareholder and representative of Blue Rhino, seeks damages and other

8    relief for the Company as hereinafter set forth.

9
                                    **PRAYER FOR RELIEF**
10
11       WHEREFORE, plaintiff demands judgment on behalf of Blue Rhino as follows:

12   1.    Determining that this action is a proper derivative action maintainable under

13   California law;

14   2.    Awarding damages and/or restitution in favor of plaintiff, on behalf of Blue Rhino,

15   and against defendants and awarding punitive and exemplary damages as appropriate, plus pre-

16
     judgment interest;
17

18   3.    Granting equitable and/or injunctive relief as permitted by applicable law and equity,

19   including attaching, impounding, imposing a constructive trust on or otherwise restricting the

20   proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf

21   of Blue Rhino has an effective remedy;

22
     4.    Awarding plaintiff reasonable attorneys' fees and costs, as well as all other
23
24   recoverable litigation expenses; and

25   5.    Granting such other and further relief as this Court may deem just and proper.

26

27

28

                                          - 48 -

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

4 DATED: April 19, 2004

5
BRIAN BARRY (SBN 135631)
**LAW OFFICE OF BRIAN BARRY**

6 1801 Ave. of the Stars, Suite 307
Los Angeles, California 90067

7 Telephone:    (310) 788-0831
Facsimile:    (310) 788-0841

8
**BRODSKY & SMITH, LLC**

9 MARC L. ACKERMAN
EVAN J. SMITH

10 JASON L. BRODSKY
Two Bala Plaza, Suite 602

11 Bala Cynwyd, PA 19004
Telephone:    (610) 667-6200

12 Facsimile    (610) 667-9029

13
Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

The undersigned verifies that the Second Amended Verified Shareholder Derivative

Complaint is based on information which either I have furnished to counsel and/or upon which

information has been gathered by counsel in the course of this lawsuit. The language of the

pleading is that of counsel and not of signer. Signer verifies that he has read said pleading and

that all averments therein are true and correct to the best of the signer's personal knowledge,

information and belief. This verification is made subject to the penalties relating to unsworn

falsifications to authorities and under penalty of perjury.

Randy Gish

Dated:

Document: Second Amended Verified Shareholder Derivative Complaint.

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, the undersigned, declare: that I am employed in the aforesaid County, State of California in the office of a member of the Bar of this Court at whose direction the following service was made. I am over the age of 18 and not a party to the within entitled action; my business address is: 1801 Avenue of the Stars, Suite 307, Los Angeles, California 90067.

On April 20, 2004, I served upon the interested parties in this action, pursuant to Fed. R. Civ. P. Rule 5(b) and Local Rule 5-3, the document described as follows:

### SECOND AMENDED COMPLAINT

[X]   by sending a true and correct copy thereof VIA U.S. Mail to:

**BRODSKY & SMITH, LLC**
MARC L. ACKERMAN
EVAN J. SMITH
JASON L. BRODSKY
Two Bala Plaza, Suite 602
Bala Cynwyd, PA 19004

**McDERMOTT, WILL & EMERY**
Eric Landau
Steven J. Aaronoff.
18191 Von Karman Avenue, Suite 400
Irvine, CA 92612

I declare under penalty of perjury, under the laws of the State of California and the United States of America, that the foregoing is true and correct. Executed on April 20, 2004 at Los Angeles, Los Angeles County, California.

Brian Barry